## UNITED STATES *v.* CURTISS-WRIGHT EXPORT CORP. ET AL.

No. 98. Argued November 19, 20, 1936.—Decided December 21, 1936.

*Mr. Martin Conboy,* with whom *Solicitor General Reed, Assistant Attorney General McMahon,* and *Messrs. William W. Barron* and *Charles A. Horsky* were on the brief, for the United States.

*Mr. George Z. Medalie,* with whom *Messrs. J. Edward Lumbard, Jr.,* and *Theodore S. Hope, Jr.,* were on the brief, for John S. Allard et al., appellees.

308

*Mr. William Wallace,* with whom *Mr. Robert D. Shea* was on the brief, for the Curtiss-Wright Export Corp. et al., appellees.

310

*Mr. Neil P. Cullom* was on the brief for Barr Shipping Corp. et al., appellees.

Mr. Justice Sutherland delivered the opinion of the Court.

On January 27, 1936, an indictment was returned in the court below, the first count of which charges that appellees, beginning with the 29th day of May, 1934, conspired to sell in the United States certain arms of war, namely fifteen machine guns, to Bolivia, a country then engaged in armed conflict in the Chaco, in violation of the Joint Resolution of Congress approved May 28, 1934, and the provisions of a proclamation issued on the same day by the President of the United States pursuant to authority conferred by § 1 of the resolution. In pursuance of the conspiracy, the commission of certain overt acts was alleged, details of which need not be stated. The Joint Resolution (c. 365, 48 Stat. 811) follows:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That if the President finds that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reëstablishment of peace between those countries, and if after consultation with the governments of other American Republics and with their coöperation, as well as that of such other governments as he may deem necessary, he makes proclamation to that effect, it shall be unlawful to sell, except under such limitations and exceptions as the President prescribes, any arms or munitions of war in any place in the United States to the countries now engaged in that armed conflict, or to any person, company, or association acting in the interest of either country, until otherwise ordered by the President or by Congress.

"Sec. 2. Whoever sells any arms or munitions of war in violation of section 1 shall, on conviction, be punished by a fine not exceeding $10,000 or by imprisonment not exceeding two years, or both."

The President's proclamation (48 Stat. 1744), after reciting the terms of the Joint Resolution, declares:

"Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, acting under and by virtue of the authority conferred in me by the said joint resolution of Congress, do hereby declare and proclaim that I have found that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reëstablishment of peace between those countries, and that I have consulted with the governments of other American Republics and have been assured of the coöperation of such governments as I have deemed necessary as contemplated by the said joint resolution; and I do hereby admonish all citizens of the

United States and every person to abstain from every violation of the provisions of the joint resolution above set forth, hereby made applicable to Bolivia and Paraguay, and I do hereby warn them that all violations of such provisions will be rigorously prosecuted.

"And I do hereby enjoin upon all officers of the United States charged with the execution of the laws thereof, the utmost diligence in preventing violations of the said joint resolution and this my proclamation issued thereunder, and in bringing to trial and punishment any offenders against the same.

"And I do hereby delegate to the Secretary of State the power of prescribing exceptions and limitations to the application of the said joint resolution of May 28, 1934, as made effective by this my proclamation issued thereunder."

On November 14, 1935, this proclamation was revoked (49 Stat. 3480), in the following terms:

"Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, do hereby declare and proclaim that I have found that the prohibition of the sale of arms and munitions of war in the United States to Bolivia or Paraguay will no longer be necessary as a contribution to the reëstablishment of peace between those countries, and the above-mentioned Proclamation of May 28, 1934, is hereby revoked as to the sale of arms and munitions of war to Bolivia or Paraguay from and after November 29, 1935, provided, however, that this action shall not have the effect of releasing or extinguishing any penalty, forfeiture or liability incurred under the aforesaid Proclamation of May 28, 1934, or the Joint Resolution of Congress approved by the President on the same date; and that the said Proclamation and Joint Resolution shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."

Appellees severally demurred to the first count of the indictment on the grounds (1) that it did not charge facts sufficient to show the commission by appellees of any offense against any law of the United States; (2) that this count of the indictment charges a conspiracy to violate the joint resolution and the Presidential proclamation, both of which had expired according to the terms of the joint resolution by reason of the revocation contained in the Presidential proclamation of November 14, 1935, and were not in force at the time when the indictment was found. The points urged in support of the demurrers were, first, that the joint resolution effects an invalid delegation of legislative power to the executive; second, that the joint resolution never became effective because of the failure of the President to find essential jurisdictional facts; and third, that the second proclamation operated to put an end to the alleged liability under the joint resolution.

The court below sustained the demurrers upon the first point, but overruled them on the second and third points. 14 F. Supp. 230. The government appealed to this court under the provisions of the Criminal Appeals Act of March 2, 1907, 34 Stat. 1246, as amended, U. S. C. Title 18, § 682. That act authorizes the United States to appeal from a district court direct to this court in criminal cases where, among other things, the decision sustaining a demurrer to the indictment or any count thereof is based upon the invalidity or construction of the statute upon which the indictment is founded.

*First.* It is contended that by the Joint Resolution, the going into effect and continued operation of the resolution was conditioned (a) upon the President's judgment as to its beneficial effect upon the reëstablishment of peace between the countries engaged in armed conflict in the Chaco; (b) upon the making of a proclama-

tion, which was left to his unfettered discretion, thus constituting an attempted substitution of the President's will for that of Congress; (c) upon the making of a proclamation putting an end to the operation of the resolution, which again was left to the President's unfettered discretion; and (d) further, that the extent of its operation in particular cases was subject to limitation and exception by the President, controlled by no standard. In each of these particulars, appellees urge that Congress abdicated its essential functions and delegated them to the Executive.

Whether, if the Joint Resolution had related solely to internal affairs it would be open to the challenge that it constituted an unlawful delegation of legislative power to the Executive, we find it unnecessary to determine. The whole aim of the resolution is to affect a situation entirely external to the United States, and falling within the category of foreign affairs. The determination which we are called to make, therefore, is whether the Joint Resolution, as applied to that situation, is vulnerable to attack under the rule that forbids a delegation of the law-making power. In other words, assuming (but not deciding) that the challenged delegation, if it were confined to internal affairs, would be invalid, may it nevertheless be sustained on the ground that its exclusive aim is to afford a remedy for a hurtful condition within foreign territory?

It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted.

The two classes of powers are different, both in respect of their origin and their nature. The broad statement that the federal government can exercise no powers except

those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers *then possessed by the states* such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. *Carter* v. *Carter Coal Co.*, 298 U. S. 238, 294. That this doctrine applies only to powers which the states had, is self evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source. During the colonial period, those powers were possessed exclusively by and were entirely under the control of the Crown. By the Declaration of Independence, "the Representatives of the United States of America" declared the United [not the several] Colonies to be free and independent states, and as such to have "full Power to levy War, conclude Peace, contract Alliances, establish Commerce and to do all other Acts and Things which Independent States may of right do."

As a result of the separation from Great Britain by the colonies acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America. Even before the Declaration, the colonies were a unit in foreign affairs, acting through a common agency—namely the Continental Congress, composed of delegates from the thirteen colonies. That agency exercised the powers of war and peace, raised an army, created a navy, and finally adopted the Declaration of Independence. Rulers come and go; governments end and forms of government change; but sovereignty survives. A political society cannot endure

without a supreme will somewhere. Sovereignty is never held in suspense. When, therefore, the external sovereignty of Great Britain in respect of the colonies ceased, it immediately passed to the Union. *See Penhallow* v. *Doane,* 3 Dall. 54, 80–81.. That fact was given practical application almost at once. The treaty of peace, made on September 23, 1783, was concluded between his Brittanic Majesty and the "United States of America." 8 Stat.—European Treaties—80.

The Union existed before the Constitution, which was ordained and established among other things to form "a more perfect Union." Prior to that event, it is clear that the Union, declared by the Articles of Confederation to be "perpetual," was the sole possessor of external sovereignty and in the Union it remained without change save in so far as the Constitution in express terms qualified its exercise. The Framers' Convention was called and exerted its powers upon the irrefutable postulate that though the states were several their people in respect of foreign affairs were one. Compare *The Chinese Exclusion Case,* 130 U. S. 581, 604, 606. In that convention, the entire absence of state power to deal with those affairs was thus forcefully stated by Rufus King:

"The states were not 'sovereigns' in the sense contended for by some. They did not possess the peculiar features of sovereignty,—they could not make war, nor peace, nor alliances, nor treaties. Considering them as political beings, they were dumb, for they could not speak to any foreign sovereign whatever. They were deaf, for they could not hear any propositions from such sovereign. They had not even the organs or faculties of defence or offence, for they could not of themselves raise troops, or equip vessels, for war." 5 Elliott's Debates 212.[1]

[1] In general confirmation of the foregoing views, see 1 Story on the Constitution, 4th ed., §§ 198–217, and especially §§ 210, 211, 213, 214, 215 (p. 153), 216.

It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens (see *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 356); and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law. As a member of the family of nations, the right and power of the United States in that field are equal to the right and power of the other members of the international family. Otherwise, the United States is not completely sovereign. The power to acquire territory by discovery and occupation (*Jones* v. *United States,* 137 U. S. 202, 212), the power to expel undesirable aliens (*Fong Yue Ting* v. *United States,* 149 U. S. 698, 705 *et seq.*), the power to make such international agreements as do not constitute treaties in the constitutional sense (*Altman & Co.* v. *United States,* 224 U. S. 583, 600–601; Crandall, Treaties, Their Making and Enforcement, 2d ed., p. 102 and note 1), none of which is expressly affirmed by the Constitution, nevertheless exist as inherently inseparable from the conception of nationality. This the court recognized, and in each of the cases cited found the warrant for its conclusions not in the provisions of the Constitution, but in the law of nations.

In *Burnet* v. *Brooks,* 288 U. S. 378, 396, we said, "As a nation with all the attributes of sovereignty, the United States is vested with all the powers of government necessary to maintain an effective control of international relations." Cf. *Carter* v. *Carter Coal Co., supra,* p. 295.

Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, "The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." Annals, 6th Cong., col. 613. The Senate Committee on Foreign Relations at a very early day in our history (February 15, 1816), reported to the Senate, among other things, as follows:

"The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. For his conduct he is responsible to the Constitution. The committee consider this responsibility the surest pledge for the faithful discharge of his duty. They think the interference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety. The nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch." U. S. Senate, Reports, Committee on Foreign Relations, vol. 8, p. 24.

It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an

exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved. Moreover, he, not Congress, has the better opportunity ,of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results. Indeed, so clearly is this true that the first President refused to accede to a request to lay before the House of Representatives the instructions, correspondence and documents relating to the negotiation of the Jay Treaty—a refusal the wisdom of which was recognized by the House itself and has never since been doubted. In his reply to the request, President Washington said:

"The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely

impolitic; for this might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers. The necessity of such caution and secrecy was one cogent reason for vesting the power of making treaties in the President, with the advice and consent of the Senate, the principle on which that body was formed confining it to a small number of members. To admit, then, a right in the House of Representatives to demand and to have as a matter of course all the papers respecting a negotiation with a foreign power would be to establish a dangerous precedent." 1 Messages and Papers of the Presidents, p. 194.

The marked difference between foreign affairs and domestic affairs in this respect is recognized by both houses of Congress in the very form of their requisitions for information from the executive departments. In the case of every department except the Department of State, the resolution *directs* the official to furnish the information. In the case of the State Department, dealing with foreign affairs, the President is *requested* to furnish the information "if not incompatible with the public interest." A statement that to furnish the information is not compatible with the public interest rarely, if ever, is questioned.

When the President is to be authorized by legislation to act in respect of a matter intended to affect a situation in foreign territory, the legislator properly bears in mind the important consideration that the form of the President's action—or, indeed, whether he shall act at all—may well depend, among other things, upon the nature of the confidential information which he has or may thereafter receive, or upon the effect which his action may have upon our foreign relations. This consideration, in connection with what we have already said on the subject, discloses the unwisdom of requiring Congress in this field

of governmental power to lay down narrowly definite standards by which the President is to be governed. As this court said in *Mackenzie* v. *Hare,* 239 U. S. 299, 311. "As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. *We should hesitate long before limiting or embarrassing such powers."* (Italics supplied.)

In the light of the foregoing observations, it is evident that this court should not be in haste to apply a general rule which will have the effect of condemning legislation like that under review as constituting an unlawful delegation of legislative power. The principles which justify such legislation find overwhelming support in the unbroken legislative practice which has prevailed almost from the inception of the national government to the present day.

Let us examine, in chronological order, the acts of legislation which warrant this conclusion:

The Act of June 4, 1794, authorized the President to lay, regulate and revoke embargoes. He was "authorized" "whenever, in his opinion, the public safety shall so require" to lay the embargo upon all ships and vessels in the ports of the United States, including those of foreign nations "under such regulations as the circumstances of the case may require, and to continue or revoke the same, whenever he shall think proper." C. 41, 1 Stat. 372. A prior joint resolution of May 7, 1794 (1 Stat. 401), had conferred *unqualified* power on the President to grant clearances, notwithstanding an existing embargo, to ships or vessels belonging to citizens of the United States bound to any port beyond the Cape of Good Hope.

The Act of March 3, 1795 (c. 53, 1 Stat. 444), gave the President authority to permit the exportation of arms, cannon and military stores, the law prohibiting such ex-

ports to the contrary notwithstanding, the only pre-scribed guide for his action being that such exports should be in "cases connected with the security of the commercial interest of the United States, and for public purposes only."

By the Act of June 13, 1798 (c. 53, § 5, 1 Stat. 566), it was provided that if the government of France "shall clearly disavow, and shall be found to refrain from the aggressions, depredations and hostilities" theretofore maintained against vessels and property of the citizens of the United States, "in violation of the faith of treaties, and the laws of nations, and shall thereby acknowledge the just claims of the United States to be considered as in all respects neutral, . . . it shall be lawful for the President of the United States, being well ascertained of the premises, to remit and discontinue the prohibitions and restraints hereby enacted and declared; and he shall be, and is hereby authorized to make proclamation thereof accordingly."

By § 4 of the Act of February 9, 1799 (c. 2, 1 Stat. 615), it was made "lawful" for the President, "if he shall deem it expedient and consistent with the interest of the United States," by order to remit certain restraints and prohibitions imposed by the act with respect to the French Republic, and also to revoke any such order "whenever, in his opinion, the interest of the United States shall require."

Similar authority, qualified in the same way, was con-ferred by § 6 of the Act of February 7, 1800, c. 10, 2 Stat. 9.

Section 5 of the Act of March 3, 1805 (c. 41, 2 Stat. 341), made it lawful for the President, whenever an armed vessel entering the harbors or waters within the jurisdiction of the United States and required to depart therefrom should fail to do so, not only to employ the land and naval forces to compel obedience, but "if he

shall think it proper, it shall be lawful for him to forbid, by proclamation, all intercourse with such vessel, and with every armed vessel of the same nation, and the officers and crew thereof; to prohibit all supplies and aid from being furnished them" and to do various other things connected therewith. Violation of the President's proclamation was penalized.

On February 28, 1806, an act was passed (c. 9, 2 Stat. 351) to suspend commercial intercourse between the United States and certain parts of the Island of St. Domingo. A penalty was prescribed for its violation. Notwithstanding the positive provisions of the act, it was by § 5 made "lawful" for the President to remit and discontinue the restraints and prohibitions imposed by the act at any time "if he shall deem it expedient and consistent with the interests of the United States" to do so. Likewise in respect of the Non-intercourse Act of March 1, 1809, (c. 24, 2 Stat. 528); the President was "authorized" (§ 11, p. 530), in case either of the countries affected should so revoke or modify her edicts "as that they shall cease to violate the neutral commerce of the United States," to proclaim the fact, after which the suspended trade might be renewed with the nation so doing.

Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs. Many, though not all, of these acts are designated in the footnote.[2]

---

[2] Thus, the President has been broadly "authorized" to suspend embargo acts passed by Congress, "if in his judgment the public interest should require it" (Act of December 19, 1806, c. 1, § 3, 2 Stat. 411), or if, "in the judgment of the President," there has been such suspen-

It well may be assumed that these legislative precedents were in mind when Congress passed the joint resolutions of April 22, 1898, 30 Stat. 739; March 14, 1912, 37 Stat. 630; and January 31, 1922, 42 Stat. 361, to prohibit the export of coal or other war material. The resolution of 1898 authorized the President "in his discretion, and with such limitations and exceptions as shall seem to him expedient" to prohibit such exportations. The striking identity of language found in the second resolution mentioned above and in the one now under review will be

sion of hostilities abroad as may render commerce of the United States sufficiently safe. Act of April 22, 1808, c. 52, 2 Stat. 490. See, also, Act of March 3, 1817, c. 39, § 2, 3 Stat. 361. Compare, but as to reviving an embargo act, the Act of May 1, 1810, c. 39, § 4, 2 Stat. 605.

Likewise, Congress has passed numerous acts laying tonnage and other duties on foreign ships, in retaliation for duties enforced on United States vessels, but providing that if the President should be satisfied that the countervailing duties were repealed or abolished, then he might by proclamation suspend the duties as to vessels of the nation so acting. Thus, the President has been "authorized" to proclaim the suspension. Act of January 7, 1824, c. 4, § 4, 4 Stat. 3; Act of May 24, 1828, c. 111, 4 Stat. 308; Act of July 24, 1897, c. 13, 30 Stat. 214. Or it has been provided that the suspension should take effect whenever the President "shall be satisfied" that the discriminating duties have been abolished. Act of March 3, 1815, c. 77, 3 Stat. 224; Act of May 31, 1830, c. 219, § 2, 4 Stat. 425. Or that the President "may direct" that the tonnage duty shall cease to be levied in such circumstances. Act of July 13, 1832, c. 207, § 3, 4 Stat. 578. And compare Act of June 26, 1884, c. 121, § 14, 23 Stat. 53, 57.

Other acts, for retaliation against discriminations as to United States commerce, have placed broad powers in the hands of the President, "authorizing" even the total exclusion of vessels of any foreign country so offending (Act of June 19, 1886, c. 421, § 17, 24 Stat. 79, 83), or the increase of duties on its goods or their total exclusion from the United States (Act of June 17, 1930, c. 497, § 388, 46 Stat. 590, 704), or the exclusion of its goods or the detention, in certain circumstances, of its vessels, or the exclusion of its vessels or nationals from privileges similar to those which it has denied to citizens of the United States (Act of September 8, 1916, c. 463, §§ 804–806, 39 Stat.

seen upon comparison. The resolution of March 14, 1912, provides:

"That whenever the President shall find that in any American country conditions of domestic violence exist which are promoted by the use of arms or munitions of war procured from the United States, and shall make proclamation thereof, it shall be unlawful to export except under such limitations and exceptions as the Presi-

---

756, 799–800). As to discriminations by particular countries, it has been made lawful for the President, by proclamation, which he "may in his discretion, apply . . . to any part or all" of the subjects named, to exclude certain goods of the offending country, or its vessels. Act of March 3, 1887, c. 339, 24 Stat. 475. And compare Act of July 26, 1892, c. 248, 27 Stat. 267. Compare, also, authority given the Postmaster General to reduce or enlarge rates of foreign postage, among other things, for the purpose of counteracting any adverse measures affecting our postal intercourse with foreign countries. Act of March 3, 1851, c. 20, § 2, 9 Stat. 587, 589.

The President has been "authorized" to suspend an act providing for the exercise of judicial functions by ministers, consuls and other officers of the United States in the Ottoman dominions and Egypt whenever he "shall receive satisfactory information" that the governments concerned have organized tribunals likely to secure to United States citizens the same impartial justice enjoyed under the judicial functions exercised by the United States officials. Act of March 23, 1874, c. 62, 18 Stat. 23.

Congress has also passed acts for the enforcement of treaties or conventions, to be effective only upon proclamation of the President. Some of them may be noted which "authorize" the President to make proclamation when he shall be "satisfied" or shall receive "satisfactory evidence" that the other nation has complied: Act of August 5, 1854, c. 269, §§ 1, 2, 10 Stat. 587; Act of March 1, 1873, c. 213, §§ 1, 2, 17 Stat. 482; Act of August 15, 1876, c. 290, 19 Stat. 200; Act of December 17, 1903, c. 1, § 1, 33 Stat. 3. *Cf.* Act of June 11, 1864, c. 116, § 1, 13 Stat. 121; Act of February 21, 1893, c. 150, 27 Stat. 472.

Where appropriate, Congress has provided that violation of the President's proclamations authorized by the foregoing acts shall be penalized. See, *e. g.*, Act of June 19, 1886; Act of March 3, 1887; Act of September 8, 1916; Act of June 17, 1930—all *supra.*

dent shall prescribe any arms or munitions of war from any place in the United States to such country until otherwise ordered by the President or by Congress.

"SEC. 2. That any shipment of material hereby declared unlawful after such a proclamation shall be punishable by fine not exceeding ten thousand dollars, or imprisonment not exceeding two years, or both."

The third resolution is in substantially the same terms, but extends to any country in which the United States exercises extraterritorial jurisdiction, and provides for the President's action not only when conditions of domestic violence exist which *are* promoted, but also when such conditions *may be* promoted, by the use of such arms or munitions of war.

We had occasion to review these embargo and kindred acts in connection with an exhaustive discussion of the general subject of delegation of legislative power in a recent case, *Panama Refining Co.* v. *Ryan,* 293 U. S. 388, 421–422, and in justifying such acts, pointed out that they confided to the President "an authority which was cognate to the conduct by him of the foreign relations of the government."

The result of holding that the joint resolution here under attack is void and unenforceable as constituting an unlawful delegation of legislative power would be to stamp this multitude of comparable acts and resolutions as likewise invalid. And while this court may not, and should not, hesitate to declare acts of Congress, however many times repeated, to be unconstitutional if beyond all rational doubt it finds them to be so, an impressive array of legislation such as we have just set forth, enacted by nearly every Congress from the beginning of our national existence to the present day, must be given unusual weight in the process of reaching a correct determination of the problem. A legislative practice such as we have here, evidenced not by only occasional instances,

but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice, to be found in the origin and history of the power involved, or in its nature, or in both combined.

In *The Laura*, 114 U. S. 411, 416, this court answered a challenge to the constitutionality of a statute authorizing the Secretary of the Treasury to remit or mitigate fines and penalties in certain cases, by repeating the language of a very early case (*Stuart* v. *Laird*, 1 Cranch 299, 309) that the long practice and acquiescence under the statute was a "practical exposition . . . too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed." In *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U. S. 53, 57, the constitutionality of R. S. § 4952, conferring upon the author, inventor, designer or proprietor of a photograph certain rights, was involved. Mr. Justice Miller, speaking for the court, disposed of the point by saying: "The construction placed upon the Constitution by the first act of 1790, and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive."

In *Field* v. *Clark*, 143 U. S. 649, 691, this court declared that " . . . the practical construction of the Constitution, as given by so many acts of Congress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible with the supreme law of the land." The rule is one which has been stated and applied many times by this court. As examples, see

*Ames* v. *Kansas,* 111 U. S. 449, 469; *McCulloch* v. *Maryland,* 4 Wheat. 316, 401; *Downes* v. *Bidwell,* 182 U. S. 244, 286.

The uniform, long-continued and undisputed legislative practice just disclosed rests upon an admissible view of the Constitution which, even if the practice found far less support in principle than we think it does, we should not feel at liberty at this late day to disturb.

We deem it unnecessary to consider, *seriatim,* the several clauses which are said to evidence the unconstitutionality of the Joint Resolution as involving an unlawful delegation of legislative power. It is enough to summarize by saying that, both upon principle and in accordance with precedent, we conclude there is sufficient warrant for the broad discretion vested in the President to determine whether the enforcement of the statute will have a beneficial effect upon the reëstablishment of peace in the affected countries; whether he shall make proclamation to bring the resolution into operation; whether and when the resolution shall cease to operate and to make proclamation accordingly; and to prescribe limitations and exceptions to which the enforcement of the resolution shall be subject.

*Second.* The second point raised by the demurrer was that the Joint Resolution never became effective because the President failed to find essential jurisdictional facts; and the third point was that the second proclamation of the President operated to put an end to the alleged liability of appellees under the Joint Resolution. In respect of both points, the court below overruled the demurrer, and thus far sustained the government.

The government contends that upon an appeal by the United States under the Criminal Appeals Act from a decision holding an indictment bad, the jurisdiction of the court does not extend to questions decided in favor of the United States, but that such questions may only be re-

viewed in the usual way after conviction. We find nothing in the words of the statute or in its purposes which justifies this conclusion. The demurrer in the present case challenges the validity of the statute upon three separate and distinct grounds. If the court below had sustained the demurrer without more, an appeal by the government necessarily would have brought here for our determination all of these grounds, since in that case the record would not have disclosed whether the court considered the statute invalid upon one particular ground or upon all of the grounds alleged. The judgment of the lower court is that the statute is invalid. Having held that this judgment cannot be sustained upon the particular ground which that court assigned, it is now open to this court to inquire whether or not the judgment can be sustained upon the rejected grounds which also challenge the validity of the statute and, therefore, constitute a proper subject of review by this court under the Criminal Appeals Act. *United States* v. *Hastings*, 296 U. S. 188, 192.

In *Langnes* v. *Green*, 282 U. S. 531, where the decree of a district court had been assailed upon two grounds and the circuit court of appeals had sustained the attack upon one of such grounds only, we held that a respondent in certiorari might nevertheless urge in this court in support of the decree the ground which the intermediate appellate court had rejected. That principle is applicable here.

We proceed, then, to a consideration of the second and third grounds of the demurrers which, as we have said, the court below rejected.

1. The Executive proclamation recites, "I have found that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reëstablishment of peace between those countries,

and that I have consulted with the governments of other American Republics *and have been assured of the coöperation of such governments as I have deemed necessary as contemplated by the said joint resolution.*" This finding satisfies every requirement of the Joint Resolution. There is no suggestion that the resolution is fatally uncertain or indefinite; and a finding which follows its language, as this finding does, cannot well be challenged as insufficient.

But appellees, referring to the words which we have italicized above, contend that the finding is insufficient because the President does not declare that the coöperation of such governments as he deemed necessary included any American republic and, therefore, the recital contains no affirmative showing of compliance in this respect with the Joint Resolution. The criticism seems to us wholly wanting in substance. The President recites that he has consulted with the governments of other American republics, and that he has been assured of the coöperation of such governments as he deemed necessary *as contemplated by the joint resolution.* These recitals, construed together, fairly include within their meaning American republics.

2. The second proclamation of the President, revoking the first proclamation, it is urged, had the effect of putting an end to the Joint Resolution, and in accordance with a well-settled rule, no penalty could be enforced or punishment inflicted thereafter for an offense committed during the life of the Joint Resolution in the absence of a provision in the resolution to that effect. There is no doubt as to the general rule or as to the absence of a saving clause in the Joint Resolution. But is the case presented one which makes the rule applicable?

It was not within the power of the President to repeal the Joint Resolution; and his second proclamation did not

purport to do so. It "revoked" the first proclamation; and the question is, did the revocation of the proclamation have the effect of abrogating the resolution or of precluding its enforcement in so far as that involved the prosecution and punishment of offenses committed during the life of the first proclamation? We are of opinion that it did not.

Prior to the first proclamation, the Joint Resolution was an existing law, but dormant, awaiting the creation of a particular situation to render it active. No action or lack of action on the part of the President could destroy its potentiality. Congress alone could do that. The happening of the designated events—namely, the finding of certain conditions and the proclamation by the President—did not call the law into being. It created the occasion for it to function. The second proclamation did not put an end to the law or affect what had been done in violation of the law. The effect of the proclamation was simply to remove for the future, a condition of affairs which admitted of its exercise.

We should have had a different case if the Joint Resolution had expired by its own terms upon the issue of the second proclamation. Its operative force, it is true, was limited to the period of time covered by the first proclamation. And when the second proclamation was issued, the resolution ceased to be a rule for the future. It did not cease to be the law for the antecedent period of time. The distinction is clearly pointed out by the Superior Court of Judicature of New Hampshire in *Stevens* v. *Dimond*, 6 N. H. 330, 332, 333. There, a town by-law provided that if certain animals should be found going at large between the first day of April and the last day of October, etc., the owner would incur a prescribed penalty. The trial court directed the jury that the by-law, being in force for a year only, had expired so that the defendant could not be called upon to answer for a violation which

occurred during the designated period. The state appellate court reversed, saying that when laws "expire by their own limitation, or are repealed, they cease to be the law in relation to the past, as well as the future, and can no longer be enforced in any case. No case is, however, to be found in which it was ever held before that they thus ceased to be law, unless they expired by express limitation in themselves, or were repealed. It has never been decided that they cease to be law, merely because the time they were intended to regulate had expired. . . . A very little consideration of the subject will convince any one that a limitation of the time to which a statute is to apply, is a very different thing from the limitation of the time a statute is to continue in force."

The first proclamation of the President was in force from the 28th day of May, 1934, to the 14th day of November, 1935. If the Joint Resolution had in no way depended upon Presidential action, but had provided explicitly that, at any time between May 28, 1934, and November 14, 1935, it should be unlawful to sell arms or munitions of war to the countries engaged in armed conflict in the Chaco, it certainly could not be successfully contended that the law would expire with the passing of the time fixed in respect of offenses committed during the period.

The judgment of the court below must be reversed and the cause remanded for further proceedings in accordance with the foregoing opinion.

*Reversed.*

MR. JUSTICE MCREYNOLDS does not agree. He is of opinion that the court below reached the right conclusion and its judgment ought to be affirmed.

MR. JUSTICE STONE took no part in the consideration or decision of this case.