**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bahram MECHANIC, a/k/a Barry Mechanic, a/k/a Myron Bahram Mechanic, and Mary Akers Mechanic, Defendants-Appellants.**

**No. 86–2223.**

United States Court of Appeals,
Fifth Circuit.

Jan. 30, 1987.

Mike DeGeurin, Houston, Tex., for defendants-appellants.

Philip Hilder, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, POLITZ, and WILLIAMS, Circuit Judges.

GEE, Circuit Judge:

Bahram and Mary Mechanic were convicted of attempting to export a microwave calibration device without a validated export license, in violation of the Export Administration Act (EAA) of 1979 and regulations promulgated under that Act. They raise a constitutional challenge to the regulation that proscribes attempts to violate the Act. Because we conclude there is no constitutional infirmity, we AFFIRM.

### Facts

The facts relevant to this appeal are undisputed. Bahram (Barry) Mechanic and his ex-sister-in-law, Mary Akers Mechanic, constituted the entire personnel roster for Faratel, Inc., an operation located in a small office in Houston, Texas. In December 1984, Mary called Hughes Aircraft to obtain a quote for a plug-in sweep generator, stating Faratel had a West German client who wanted one shipped to Switzerland. Hughes gave a foreign price quotation, adding that the item was subject to United States export control regulations and that delivery was contingent upon receipt of a validated export license. In February 1985, Mary called Hughes again, but requested a domestic price quotation, stating that Faratel had a foreign client who intended to use the device in a Houston-based beeper-pager operation. This use is not compatible with the requested equipment, which is primarily used in laboratories to develop radar and military communication systems, such as guided missile tracking.

Hughes shipped the equipment in late March 1985. Executing a search warrant, the U.S. Customs Service intercepted the crate at a Houston airport and installed a tracking device. While maintaining surveillance, Customs Service personnel observed Barry and Mary repack the generator in a footlocker. They later observed one Eugene Krug check the footlocker as baggage on his flight to Zurich. Krug was detained at the airport and Barry and Mary were later arrested. The first trial resulted in a hung jury; the jury at the second trial acquitted Krug, but convicted Barry and Mary.

### I. Constitutionality of the Regulation Prohibiting Attempts to Export

When the Mechanics were busying themselves with the sweep generator in April 1985, the Export Administration Act of 1979 was not in effect of its own force. On the expiration date of Congress's last extension of the Act, March 30, 1984, the President issued Executive Order No. 12470, pursuant to special powers granted him under the International Economic Emergency Powers Act (IEEPA). Pub.L. No. 95–223, 91 Stat. 1625 (1977) (codified at 50 U.S.C. § 1701–1706). The Order declared a national economic emergency and continued the operation of the provisions of the EAA of 1979 and all rules and regulations under it. The President revoked the Order after signing into law the Export

Administration Amendments Act of 1985 (EAAA). Pub.L. No. 99–64, 99 Stat. 120 (July 12, 1985). Thus, at the time the offenses were committed in April 1985, the EAA of 1979 rested solely upon the President's exercise of his powers under the IEEPA.

Furthermore, a regulation, and not the EAA itself, denounced an *attempt* to violate export controls as a criminal offense, as follows:

Solicitation and attempt. No person may do any act that solicits the commission of, or that constitutes an attempt to bring about, a violation of the Export Administration Act or any regulation, order, or license issued under the Act.

15 C.F.R. § 387.3(a) (1985).

The EAA of 1979 imposed criminal sanctions on those who knowingly violate any provision of the Act or any regulation issued under it. 50 U.S.C. App. § 2410(a) (1982).

The Mechanics contend that the regulation establishing the attempt violation exceeds the delegation of authority granted under the EAA. That is, the regulation exceeds the stated policy and unconstitutionally "enlarges the terms" of the Act.

The congressional declaration of policy, embodied in the Act, provides

It is the policy of the United States to use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary—

(A) to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States;

(B) to restrict the export of goods and technology where necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations....

50 U.S.C.App. § 2402(2)(A), (B) (1982). The EAA goes on to establish that, in order to further these policies, the President may "prohibit or curtail" the exportation of any goods, technology, or other information subject to the jurisdiction of the United States. 50 U.S.C.App. § 2405(a)(1) (applying to foreign policy controls); 50 U.S.C. App. § 2404(a)(1) (applying to national security controls).

Our Court addressed virtually the same constitutional issue in *Samora v. United States*, 406 F.2d 1095 (5th Cir.1969). In that case, the defendant was convicted of violating the Munitions Control Statute, 22 U.S.C. § 1934, and regulations under it, by attempting to export handguns to Mexico without an export license. As in today's case, a regulation, not a statute, expressly forbade attempts to export unlawfully. The parallels continue, in that the statute applied criminal sanctions to any person who willfully violated any statutory provision or any rule or regulation issued thereunder. The *Samora* Court reiterated the long-established rule that "Congress may validly provide a criminal sanction for the violation of rules or regulations which it has empowered the President or an administrative agency to enact. *Id.* at 1098 (citing *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911)). In *Samora*, the statute empowered the President "to control, in furtherance of world peace and the security and foreign policy of the United States, the export of arms, ammunition, and implements of war, including technical data relating thereto." 22 U.S.C. § 1934(a) (1964). In finding this delegation of authority constitutional, we observed that "in the field of foreign affairs, the authority delegated to the President may be broader and the requisite standards more general than in matters purely domestic." *Id.* (citing *Zemel v. Rusk*, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936)).

We perceive no basis for departing from the reasoning and result in *Samora*. The congressionally-defined policy underlying the EAA is explicitly related to the foreign

policy[1] of the United States, as was the policy undergirding the munitions control statute in *Samora*. Furthermore, under the munitions statute, Congress authorized the President to "control" the export of listed munitions; under the EAA, Congress empowered the President to "prohibit or curtail" the export of goods and technology. The Mechanics argue that the power to "prohibit or curtail" exports is more limited than the power to "control" them. This is meritless: it is axiomatic that the power to prohibit exceeds the power to control; moreover, the authority to prohibit exportation of controlled items fairly envisions the power to thwart attempts to export them. To construe this power too narrowly eviscerates the congressional purpose of preventing U.S. goods and technology from reaching those who might use them to our detriment. Our brothers in the Ninth Circuit noted, in construing the munitions statute in a case similar to *Samora*, that an effective means of controlling the exportation of listed items is to stop smugglers as they approach the border, to confiscate the items, and to impose sanctions for their almost-successful efforts. *United States v. Gurrola-Garcia*, 547 F.2d 1075, 1077 (9th Cir.1976). Otherwise, as they correctly observed, "[n]o crime would be committed until the smuggler stepped across the border, but at that point, the violator would be outside the jurisdiction of the law enforcement officers and courts directed to penalize him for the crime." *Id.* This reasoning applies with equal force in today's case.

Contrary to the Mechanics' contention, the subsequent legislative history accompanying the enactment of the Export Administration Amendments Act of 1985 supports the validity of the regulation. In that Act, Congress amended the statute, 50 U.S.C. App. § 2410(a), to include explicitly as a punishable offense an attempt to violate any provision of the Act or any regulation issued under it. From this, the Mechanics infer that Congress tacitly admitted that the prior Act did not sanction attempts and that the regulation proscribing attempts was invalid. The legislative history evinces the opposite intention. Senate Report No. 98-170 explains that

> Regulations authorized by the statute currently make attempts ... violations subject to all penalties and sanctions under the Act *and are unchanged by the amendment*. This provision ... responds to the desire of prosecutors to have an explicit provision for purposes of imposing criminal penalties.

S.Rep. No. 170, 98th Cong., 1st Sess. 17–18 (1983) (accompanying S. 979, containing the amending language that was adopted verbatim in the EAAA of 1985) (emphasis added).

We agree with the government that the amendment merely confirms that the regulation forbidding attempts to export controlled items was valid before Congress amended the statute.

The Mechanics raise an argument based upon the operation of the IEEPA, under which the President issued his Executive Order[2] continuing the EAA of 1979. They contend that the legislative veto provision in the IEEPA, 50 U.S.C. § 1706(b), is unconstitutional and nonseverable. Therefore, they assert, the entire Act is void. We need not divine what Congress's intentions were concerning severability. Section 208 of the IEEPA states: "If any provision of this Act is held invalid, the remainder of

---

1. Preserving our national security inherently implicates the conduct of foreign affairs. For example, the effectiveness of our export control policy depends upon foreign availability of controlled items and on a multilateral process to coordinate export control decisions with our allies. For a legislator's discussion of the national security and interrelated foreign policy concerns that have animated Congress, from the passage of the original Export Control Act of 1949 through the EAAA of 1985, see Zschau, *Export Controls and America's Competitive Challenge*, 1 High Tech. L.J. 1, 6–18 (1986).

2. The Mechanics also argue that, by its terms, Executive Order No. 12,470 was "a piece of Executive housekeeping to abolish obsolete regulations." A reading of Section 2 of the Order confirms that this argument is meritless. 3 C.F.R. 168 (1985).

the Act shall not be affected." Pub.L. No. 95–223, 91 Stat. 1625, 1629 (1977).

Accordingly, we AFFIRM.