UNITED STATES of America, appellee,

v.

Rafil DHAFIR, also known as Sealed Deft # 1, Maher Zagha, also known as Sealed Deft # 2, Ayman Jarwan, also known as Sealed Deft # 3, Help The Needy, also known as Sealed Deft # 5, Help The Needy Endowment Inc., also known as Sealed Deft # 6, Sealed Witness, Defendants,

Osameh Al Wahaidy, also known as Sealed Deft # 4, Defendant–Appellant.

Docket No. 05–4770–cr.

United States Court of Appeals, Second Circuit.

Argued: March 16, 2006.

Decided: Aug. 24, 2006.

Steven Ward Williams, Smith, Sovik, Kendrick & Sugnet, P.C., Syracuse, New York City, for Defendant–Appellant.

Michael C. Olmsted, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York; Brenda K. Sannes, Stephen C. Green, Assistant United States Attorneys, on the brief), Syracuse, New York City, for Appellee.

Before JACOBS, LEVAL, Circuit Judges, RAKOFF, District Judge.*

DENNIS JACOBS, Circuit Judge.

The sole issue on this appeal is whether the International Emergency Economic Powers Act ("IEEPA") constitutes an ap-

propriate delegation of congressional authority to the executive. The IEEPA authorizes the President to regulate financial transactions with foreign countries or nationals in a time of security crisis, and prescribes criminal penalties for violations of the president's regulations. Defendant–Appellant Osameh Al Wahaidy pled guilty to transferring money into Iraq on three specific occasions in 1999 and 2000, in violation of Executive Orders and regulations issued pursuant to the IEEPA, but preserved his right to bring a constitutional challenge to the statute. Al Wahaidy now appeals from the July 3, 2003 Memorandum Decision and Order of the United States District Court for the Northern District of New York (Mordue, J.) denying his motion to dismiss the indictment on the ground that the IEEPA improperly delegates Congress' authority to define criminal offenses. We affirm.

## BACKGROUND

### A. The IEEPA

The IEEPA, enacted in 1977 and codified at 50 U.S.C. § 1701 *et seq.*, confers on the President certain powers to respond to any threat to the national security, foreign policy or economy of the United States that is "unusual and extraordinary" and that "has its source in whole or substantial part outside the United States." 50 U.S.C. § 1701(a). The President is granted the power to "investigate, regulate, or prohibit" various commercial activities, including: [i] "any transactions in foreign exchange," [ii] "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and [iii] "the importing or exporting of currency or securities, by any person, or with respect to any property, subject to the

jurisdiction of the United States. . . ." 50 U.S.C. § 1702(a)(1)(A). The President is also authorized to block transactions involving property "in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States. . . ." 50 U.S.C. § 1702(a)(1)(B). These powers may be exercised only if and when the President declares a national emergency with respect to the threat, 50 U.S.C. § 1701(a), in which event "[t]he President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this title." 50 U.S.C. § 1704. The violation of an Executive Order or regulation promulgated pursuant to the IEEPA is punishable by a fine of not more than $50,000 and imprisonment for not more than twenty years. *See* 50 U.S.C. § 1705(b).[1] The IEEPA provides, however, that no person shall be held liable for acts or omissions conducted "in good faith." 50 U.S.C. § 1702(a)(3).

The IEEPA reserves a continuing role for Congress. Thus, the IEEPA provides that "[t]he President, in every possible instance, shall consult with the Congress before exercising any of the authorities granted," that he "shall consult regularly with the Congress so long as such authorities are exercised," and that he shall report periodically concerning any actions taken in the exercise of the delegated authority. 50 U.S.C. § 1703. Congress can terminate the President's declaration of emergency "by concurrent resolution pursuant to section 202 of the National Emergencies Act [50 USCS § 1622]." 50 U.S.C. § 1706(b) (emendation in original).

---

1. Section 1706 was amended in 2006 to provide for a maximum sentence of 20 years. At the time Al Wahaidy was sentenced the maximum sentence was 10 years.

## B. The Iraqi Sanctions Executive Orders & Regulations

Following the Iraqi invasion of Kuwait in August, 1990, President George H.W. Bush issued four emergency Executive Orders declaring a national emergency, and prohibiting trade, transportation and financial transactions with Iraq and Kuwait. *See* Exec. Order No. 12722, 55 Fed.Reg. 31803 (August 2, 1990); Exec. Order No. 12723, 55 Fed.Reg. 31805 (August 2, 1990); Exec. Order No. 12724, 55 Fed.Reg. 33089 (August 9, 1990); and Exec. Order No. 12725, 55 Fed.Reg. 33091 (August 9, 1990). Executive Orders 12722 and 12724 blocked the Iraqi government's property and interests in property in the United States and prohibited transactions with entities in Iraq or controlled by the Iraq government. Executive Orders 12723 and 12725 correspondingly blocked the property of the Kuwaiti government and prohibited various transactions with entities in Kuwait or controlled by the Kuwaiti government.

To implement the Executive Orders, the Office of Foreign Assets Control ("OFAC") promulgated regulations providing (in relevant part) that "no U.S. person may commit or transfer, directly or indirectly, funds or other financial or economic resources to the Government of Iraq or any person in Iraq." 31 C.F.R. § 575.210; *see also* 31 C.F.R. § 575.211 (prohibiting the evasion or avoidance of the regulations and any attempt to violate the prohibitions).

The day the President signed Executive Order 12722 declaring a national emergency, the Senate passed a resolution commending the measures taken and urging the President to act immediately to enforce the IEEPA and to impose sanctions against Iraq. *See* S. Res. 318, 101st Cong.

(1990). Several days later, the House passed its version of the Sanctions Against Iraq Act of 1990, authorizing economic sanctions under the authority of the IEEPA. H.R. 5431, 101st Cong. (2d Sess. 1990). In November 1990, Congress passed "The Iraqi Sanctions Act", declaring that Congress "supports the actions that have been taken by the President ... [and] supports the imposition and enforcement of multilateral sanctions against Iraq," and requiring that the President "continue to impose the trade embargo and other economic sanctions with respect to Iraq and Kuwait ..., pursuant to Executive Orders Numbered 12724 and 12725 (August 9, 1990) and, to the extent they are still in effect, Executive Orders Numbered 12722 and 12723 (August 2, 1990)." Iraqi Sanctions Act, Pub.L. 101–513 § 586, 104 Stat.1979, 2047–48 (1990).

## C. Al Wahaidy's Plea and Conviction

On February 19, 2003, Al Wahaidy was charged in an Indictment, which was superseded on April 23, 2003, by an Information charging three specific instances of "willfully attempt[ing] to violate and evade Executive Order Numbers 12722 and 12724 and the regulations issued under those Executive Orders and under the [IEEPA]" by transferring "funds and other economic resources to one or more persons" in Iraq. The Information alleged that the violations occurred on October 25, 1999, November 9, 1999, and February 23, 2000, and that they involved a total amount of $100,000.[2] On April 4, 2003, Al Wahaidy moved to dismiss the charges on the ground that the IEEPA unconstitutionally delegated legislative authority to the executive branch. On April 23, 2003, Al Wahaidy pled guilty to the charges in the

2. Al Wahaidy admitted that he and others attempted to transfer funds through Jordan to persons in Iraq, in violation of 31 C.F.R., Subpart B, § 575.210, which is punishable as a violation of IEEPA pursuant to 50 U.S.C.

§ 1705. Al Wahaidy said he believed the funds were being used to help needy people in Iraq; but the funds were actually used by Iraqi "agents" for a series of undisclosed projects.

Information, but he preserved his right to challenge the statute's constitutionality. On July 3, 2003, the district court denied Al Wahaidy's motion to dismiss the indictment and upheld the constitutionality of the IEEPA. On August 12, 2005, Al Wahaidy was sentenced to two years probation, 100 hours of community service, and a $5000 fine. This appeal ensued.

## DISCUSSION

Al Wahaidy argues [i] that the IEEPA is an improper delegation to the President of the Congressional authority to create criminal offenses, and [ii] that, in any event, the delegation fails on its own terms because the government has not shown that the executive has complied with the statutory reporting requirements.

### A. Constitutionality of the IEEPA

■ We review the constitutionality of a federal statute *de novo*. *United States v. Awadallah*, 349 F.3d 42, 51 (2d Cir.2003).

■ The Constitution vests in Congress the legislative power to define criminal conduct; but "our jurisprudence" has reached a "practical understanding that ... Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States*, 488 U.S. 361, 372, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). Delegations of congressional authority are upheld "[s]o long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Id.* (emendation in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928)). Under that standard, impermissible delegation has been rarely found. Since the articulation of the "intelligible principle" test in *J.W. Hampton, Jr.*, the Supreme Court has struck down only two statutes as impermissible delegations. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935) (striking down delegation to industry associations comprised of private individuals to create legally binding codes of "fair competition"); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) (striking down blanket delegation to President to criminalize the interstate transport of petroleum). Neither instance involved foreign affairs, a sphere in which delegation is afforded even broader deference. *See Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs-must of necessity paint with a brush broader than that it customarily wields in domestic areas."); *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 315–22, 57 S.Ct. 216, 81. L.Ed. 255 (1936) (explaining why delegations in the foreign affairs context differ from those in the domestic context). Thus a delegation to the executive that may be improper if confined to internal affairs might "nevertheless be sustained on the ground that its exclusive aim is to afford a remedy for a hurtful condition within foreign territory." *Curtiss–Wright*, 299 U.S. at 315, 57 S.Ct. 216. This indulgence stems from the Constitution: "In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *Id.* at 319, 57 S.Ct. 216; *see also Zemel*, 381 U.S. at 17, 85 S.Ct. 1271.

The Supreme Court has upheld Congressional delegation to the executive—under the IEEPA—to nullify certain attachments and transfers of assets. *See Dames & Moore v. Regan*, 453 U.S. 654, 675, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *Regan v. Wald*, 468 U.S. 222, 232–33, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984) (holding that regulations promulgated pursuant to the IEEPA and the Trading with the Ene-

my Act were constitutional); *see also Zemel,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (upholding the Passport Act of 1926, which gave the Secretary of State the power to grant and issue passports without setting forth standards to guide the use of his discretion). Likewise, this court and our sister circuit courts have upheld such delegations. *See Sardino v. Federal Reserve Bank,* 361 F.2d 106, 110 (2d Cir. 1966) (upholding constitutionality of the Trading with the Enemy Act); *Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1437–38 (9th Cir.1996) (upholding constitutionality of Congress' delegation of authority to renew the Cuban embargo solely upon a determination that it is "in the national interest"); *see also United States v. Esfahani,* No. 05 Cr. 0255, 2006 WL 163025, at *11 (N.D.Ill. Jan.17, 2006) (upholding constitutionality of the IEEPA); *United States v. Anvari–Hamedani,* 378 F.Supp.2d 821 (N.D.Ohio 2005) (upholding constitutionality of the IEEPA).

The Supreme Court has also upheld particular delegations of authority to define criminal offenses, although not yet in the context of the IEEPA. In *Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255, the Court upheld a Congressional resolution empowering the President to declare illegal the sale of arms to certain countries (specified by the President), without discussing any special considerations that may be implicated when the President is granted the power to define crimes. *See also United States v. Grimaud,* 220 U.S. 506, 517, 31 S.Ct. 480, 55 L.Ed. 563 (1911) ("[W]hen Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done."). In *Touby*

*v. United States,* 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991), the Supreme Court upheld a delegation of power to the Attorney General to expedite the designation of a substance as "controlled" by bypassing (for a limited time) several of the requirements for permanent scheduling. The *Touby* Court weighed the petitioner's argument that "something more than an 'intelligible principle' is required when Congress authorizes another Branch to promulgate regulations that contemplate criminal sanctions," but declined to decide whether more specific guidance was required, because the statute passed muster even under a heightened standard:

> Our cases are not entirely clear as to whether more specific guidance is in fact required. We need not resolve the issue today. We conclude that § 201(h) passes muster even if greater congressional specificity is required in the criminal context.

*Id.* at 165–66, 111 S.Ct. 1752 (internal citations omitted). The Court concluded the statute "meaningfully constrain[ed] the Attorney General's discretion to define criminal conduct," by requiring that the powers only be exercised when "necessary to avoid an imminent hazard to the public safety," by specifying what constitutes "an imminent hazard," and by requiring notice to and consideration of comments from the Secretary of Health and Human Services. *Id.* at 166–67, 111 S.Ct. 1752 (quoting the statute at issue).

■ Even if a heightened standard should apply to delegations concerning criminal offenses, the IEEPA's delegation is subject to constraints similar to those found sufficient in *Touby.* See *United States v. Arch Trading Co.,* 987 F.2d 1087, 1093 (4th Cir.1993) (comparing IEEPA's provisions with the statute upheld in *Touby*). The IEEPA "meaningfully constrains the [President's] discretion," *Touby,* 500 U.S. at 166, 111 S.Ct. 1752, by requiring

that "[t]he authorities granted to the President ... may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared." 50 U.S.C. § 1701(b). And the authorities delegated are defined and limited. *See* 50 U.S.C. § 1702.

Al Wahaidy argues that *Touby* upheld a temporary power (to define what constitutes a controlled substance under criminal law), whereas the IEEPA gives the President the power "to define conduct as criminal for an unlimited time once a national emergency is declared." The IEEPA delegation is, however, subject to the President's periodic re-affirmation of necessity and is conditioned on reporting to Congress. 50 U.S.C. § 1703. Moreover, Congress can terminate the President's declaration of emergency. 50 U.S.C. § 1706.

Certain additional factors not present in *Touby* further weigh in favor of upholding the IEEPA's criminal provisions. Significantly, the IEEPA relates to foreign affairs—an area in which the President has greater discretion. *See Dames & Moore,* 453 U.S. at 675, 101 S.Ct. 2972. Additionally, Congress endorsed the President's actions and enacted legislation codifying the sanctions. There is thus no question that " 'the will of Congress has been obeyed.' " *Touby,* 500 U.S. at 168, 111 S.Ct. 1752 (quoting *Skinner v. Mid-America Pipeline Co.,* 490 U.S. 212, 218, 109 S.Ct. 1726, 104 L.Ed.2d 250 (1989)).

## B. The President's Compliance with the IEEPA[3]

Al Wahaidy argues in any event that the constitutionality of the delegation depends upon a showing by the government that the President has complied with the statutory reporting requirements imposed upon his exercise of power under the IEEPA.[4]

---

**3.** At oral argument and in subsequent briefing, we learned that *Congress* may have failed to comply with its oversight responsibilities. Specifically, the House of Representatives may not have satisfied its obligation under the National Emergencies Act to meet "each six-month period [ ]after [the declaration of a national emergency] ... to consider a vote on a joint resolution to determine whether that emergency shall be terminated." 50 U.S.C. § 1622(b). Whether the House of Representatives' possible inaction affects the validity of the Iraqi sanctions regulations raises complicated and sensitive issues concerning separation of powers. We decline to consider this issue because it was not raised by the defendant or considered by the district court, and the record before us is incomplete.

**4.** 50 U.S.C. § 1703 provides, in part:

(b) Report to Congress upon exercise of Presidential authorities. Whenever the President exercises any of the authorities granted by this chapter [50 USCS §§ 1701 et seq.], he shall immediately transmit to the Congress a report specifying—

(1) the circumstances which necessitate such exercise of authority;

(2) why the President believes those circumstances constitute an unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States;

(3) the authorities to be exercised and the actions to be taken in the exercise of those authorities to deal with those circumstances;

(4) why the President believes such actions are necessary to deal with those circumstances; and

(5) any foreign countries with respect to which such actions are to be taken and why such actions are to be taken with respect to those countries.

(c) Periodic follow-up reports. At least once during each succeeding six-month period after transmitting a report pursuant to subsection (b) of this section with respect to an exercise of authorities under this chapter [50 USCS §§ 1701 et seq.], the President shall report to the Congress with respect to the actions taken, since the last such report, in the exercise of such authorities, and with respect to any changes which have occurred concerning any information previ-

According to Al Wahaidy, only one of the statutorily-required six-month periodic reports was proffered to the district court, and the government thereby failed to sustain its burden of proof. This argument rests on two defective premises.

First, case law does not support the idea that the government bears the burden of proving its compliance with a statute in order to establish the statute's constitutionality. Al Wahaidy cites *dicta* in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), an opinion that invalidated Congress' delegation to the President to pass a law prohibiting the interstate transport of petroleum products produced in excess of state quotas. 293 U.S. at 414–15, 55 S.Ct. 241. The Supreme Court explained that Congress' delegation failed to "declare[ ] a policy with respect to that subject[,] ... [to] set-up a standard for the President's action[,] ... [or to require] any finding by the President in the exercise of the authority to enact the prohibition." *Id.* at 415, 55 S.Ct. 241. The Supreme Court further added in *dicta*, "if ... it were possible to derive a statement of prerequisites to the President's action ..., it would still be necessary for the President to comply with those conditions and to show that compliance as the ground of his prohibition." *Id.* at 431, 55 S.Ct. 241. That *dicta* notwithstanding, we are aware of no court that has placed on the government the burden to prove compliance with a statute's requirements in order to defeat a claim that the statute is unconstitutional. *See Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (" '[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it ....' ") (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)); *Usery v. Turner Elk-*

*horn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.").

Second, regardless of who bears the burden of proving compliance with the IEEPA, the present record is not limited to a single report. The government's memorandum in opposition to Al Wahaidy's motion stated that the President had complied with the IEEPA's reporting requirements, drew the court's attention to its website where each of the reports may be found, and included an example of the report. This showing was sufficient; the district court was satisfied, and it does not appear that Al Wahaidy contested the point in the district court. *Cf. Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes.").

Public records reflect that each President has fulfilled his obligations under the IEEPA for the period (1990–2003) in which the relevant Executive Orders and regulations were in place. With respect to the Iraqi sanctions at issue here, President George H.W. Bush coordinated with Congress before and when he invoked his authority under IEEPA, and sent a "Message to Congress" on August 3, 1990 reporting his Executive Order (issued the day before) declaring a national emergency; and each President from 1990 until 2003 sent a report to Congress every six

ously furnished pursuant to paragraphs (1) through (5) of subsection (b)....

months detailing the sanctions actions. Finally, pursuant to the National Emergencies Act, 50 U.S.C. § 1622, each President has annually reported to Congress in order to continue the national emergency with respect to Iraq.

## CONCLUSION

For the foregoing reasons, we affirm the judgment.