# Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools

Public Law 81-874 does not provide statutory authority for the Commissioner of Education in the exercise of his discretion to avoid applying the full sum appropriated to the entitlements of local educational agencies for financial assistance to federally impacted schools.

The President does not have the constitutional authority to direct the Commissioner of Education or the Bureau of the Budget to impound or otherwise prevent the expenditure of funds appropriated by Congress to carry out the legislation for financial assistance to federally impacted schools, Public Law 81-874.

December 1, 1969

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
BUREAU OF THE BUDGET

You have asked us to consider whether the President may, by direction to the Commissioner of Education or to the Bureau of the Budget, impound or otherwise prevent the expenditure of funds appropriated by Congress to carry out the legislation for financial assistance to federally impacted schools, Public Law 81-874, 64 Stat. 1100 (1950) (codified as amended at 20 U.S.C. §§ 236 *et seq.* (1964 & Supp. IV 1965–1968), and Public Law 81-815, 64 Stat. 967 (Sept. 23, 1950) (codified as amended at 20 U.S.C. §§ 631 *et seq.* (1964 & Supp. IV 1965–1968)).

## I.

In July, the House of Representatives, in adopting the Joelson Amendment to the appropriations bill for the Departments of Labor and Health, Education, and Welfare ("HEW") (H.R. 13111, 91st Cong. (1969)), added approximately one billion dollars to the sum to be appropriated for various programs administered by the Office of Education. 115 Cong. Rec. 21,688–89 (1969). One of the largest increases was in the appropriation to carry out Public Law 81-874, which was raised to $585 million, nearly $400 million over the figure requested by the Administration and reported by the House Appropriations Committee. The appropriation for Public Law 81-815, on the other hand, is only $15,167,000, the same as that requested by the Administration.

The question arises whether, assuming that the appropriations carried in the Joelson Amendment are not significantly reduced by the Senate, the Administration is bound to spend the money appropriated. This memorandum considers the situation with respect to Public Law 81-874 and Public Law 81-815, particularly

the former. In a subsequent memorandum we shall consider the situation with respect to certain of the other items in the Joelson Amendment.[1]

Public Law 81-874 authorizes financial assistance for the maintenance and operation of local school districts in areas where school enrollments are affected by federal activities. Payments are made to eligible school districts which provide free public education to children who live on federal property with a parent employed on federal property (section 3(a) (codified as amended at 20 U.S.C. § 238)) and to children who either live on federal property or live with a parent employed on federal property (section 3(b)); to those school districts having a substantial increase in school enrollment resulting from federal contract activities with private companies (section 4 (codified as amended at 20 U.S.C. § 239)); and to school districts when there has been a loss of tax base as a result of the acquisition of real property by the federal government (section 2 (codified as amended at 20 U.S.C. § 237)). Where the state or local educational agency is unable to provide suitable free public education to children who live on federal property, the Commissioner of Education is required to make arrangements for such education (section 6 (codified as amended at 20 U.S.C. § 241)). Major disaster assistance is authorized for local educational agencies under section 7 of Public Law 81-874 (codified as amended at 20 U.S.C. § 241-1). It should be noted that the $585 million provided by the Joelson Amendment is for assistance "as authorized by sections 3, 6, and 7" of Public Law 81-874. 115 Cong. Rec. 21,689 (1969). Consequently, no funding is provided for sections 2 and 4, and these sections need not concern us further.

Section 3 of Public Law 81-874 (as amended and codified) requires the Commissioner to compute the "entitlement" of a local educational agency under a formula, whereby, simply stated, the number of Category A children and one-half the Category B children[2] is multiplied by the local contribution rate for the school district as determined under section 3(d). The determination of entitlement is not entirely mechanical, for within fairly narrow limits the Commissioner has discretion in selecting the basis for his determination of the local contribution rate, and other provisions permit him to make favorable adjustments in entitlements under narrowly defined circumstances (section 3(c)(2), (c)(4), (e); section 5(d)(1) (codified as amended at 20 U.S.C. § 240)).

---

[1] This memorandum does not consider title I of the Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. §§ 241a–241m (Supp. IV 1965–1968)), which, although enacted as title II of Public Law 81-874, is usually cited as a separate statute and is listed as a separate appropriation item in the Joelson Amendment. 115 Cong. Rec. 21,689 (1969).

[2] The terms "Category A" and "Category B" refer to the standards for eligibility under sections 3(a) and 3(b), respectively.

Once a district's section 3 entitlement has been determined, however, the process of making payments becomes mechanical. Section 5(b) of Public Law 81-874 (as amended and codified) provides:

> The Commissioner shall . . . from time to time pay to each local educational agency, in advance or otherwise, the amount which he estimates such agency is entitled to receive under this subchapter. . . . Sums appropriated pursuant to this subchapter for any fiscal year shall remain available, for obligation and payments with respect to amounts due local educational agencies under this subchapter for such year, until the close of the following fiscal year.

20 U.S.C. § 240(b).[3]

However, Public Law 81-874 does not constitute a promise by the United States to pay the full entitlement, for the statute contemplates that Congress may choose not to appropriate sufficient money to fund the program at 100% of entitlement. In such a circumstance section 5(c) provides that the Commissioner after deducting the amount necessary to fund section 6, shall, subject to any limitation in the appropriation act, apply the amount appropriated pro rata to the entitlements.[4] (Since the Joelson Amendment provides no funding for sections 2 and 4, this would mean that after deducting the amount necessary to fund section 6 and, perhaps, constituting a reserve for possible application to section 7,[5] the appropriation would be applied to the payment of section 3 entitlements.)

In sum, whatever limited discretionary authority the Commissioner may have with respect to determining entitlements, section 5 does not appear to permit any exercise of discretion in the application of appropriated funds to the payment of entitlements. Since the $585 million carried in the Joelson Amendment is only 90% of the total estimated entitlements, *Departments of Labor and Health, Education, and Welfare Appropriations for 1970: Hearings Before the Subcomm.*

---

[3] This provision for continued availability beyond the close of the fiscal year conflicts with section 405 of the appropriation bill, H.R. 13111, 91st Cong. (as reported by H. Comm. on Appropriations, July 24, 1969). However, we understand that HEW regards the obligation of the funds as occurring within the fiscal year, even though the precise amount due may not be ascertained until after the close of the fiscal year.

[4] Thus, he would have no authority to vary this formula in order to provide fuller funding for Category A entitlements at the expense of Category B entitlements unless Congress were so to provide in the appropriation act.

[5] It is arguable that since the Joelson Amendment appropriates funds to carry out sections 3, 6, and 7, the Commissioner could set up a reserve for contingencies under section 7, disaster assistance. On the other hand, section 7(c) of Public Law 81-874 permits the Commissioner, notwithstanding the Anti-Deficiency Act, to grant assistance under section 7 out of moneys appropriated for the other sections, such funds to be reimbursed out of subsequent appropriations for carrying out section 7. Since the statute permits such application of funds allocated to carrying out section 3, it would be hard for the Commissioner to justify withholding funds from allocation on the basis of the possibility that they might be needed for disaster assistance.

*on Departments of Labor and Health, Education, and Welfare and Related Agencies of the H. Comm. on Appropriations*, 91st Cong., pt. 5, at 229 (1969), discretionary cutbacks on entitlements would have to exceed 10% of the total before there would be any impact on the total funding of the program.

We do not, in short, find within Public Law 81-874 any statutory authority for the Commissioner in the exercise of his discretion to avoid applying to the entitlements the full sum appropriated, and we conclude that the provisions of section 5 are mandatory in this respect.[6] We understand that this conclusion is consistent with the position taken over the years by the General Counsel of the Department of Health, Education, and Welfare.[7]

Public Law 81-815 authorizes payments to assist local school districts in the construction of school facilities in areas where enrollments are increased by federal activities. The entitlement for assistance is computed under a statutory formula, and in addition there is provision for judicial review of a commissioner's determination refusing to approve part or all of any application for assistance under the Act. *Id.* § 11(b) (codified as amended at 20 U.S.C. § 641(b)). On the other hand, the mechanics of administration of Public Law 81-815 differ significantly from those of Public Law 81-874. First, the commissioner is not required to apply appropriations pro rata among the eligible districts, but in accordance with priorities which he establishes by regulation (section 3 (codified as amended at 20 U.S.C. § 633)). Second, entitlement for assistance is not computed on an annual basis, but as a share of the cost of a particular project. Thus, if funds are held up in one fiscal year, the project may be funded the next year. Finally, the commissioner is apparently free to allot, in his discretion, an indefinite share of the appropriation to section 14 purposes, school construction on Indian reservations.

While we hesitate to conclude, on this fairly summary consideration, that the Commissioner has discretionary authority under Public Law 81-815 to delay indefinitely the obligation and expenditure of funds appropriated to carry out the statute, it does appear to us that there are enough discretionary powers throughout the statute to permit him to postpone the obligation of funds during fiscal 1970. Indeed, the Joelson Amendment provides that the appropriation for Public Law 81-815 shall remain available until expended, 115 Cong. Rec. 21,689, which would seem to confirm the conclusion that there is no legal requirement that the

---

[6] Mandatory, that is, provided that the school district is in compliance with applicable federal statutes and regulations. Where a district is not in compliance, the Commissioner may have authority to withhold or terminate assistance, *see, e.g.*, Civil Rights Act of 1964, Pub. L. No. 88-352, tit. VI, 78 Stat. 241, 252 (codified at 42 U.S.C. §§ 2000d *et seq.* (1964 & Supp. IV 1965–1968)); 45 C.F.R. pt. 80 (1968). Whether in the event of such a withholding or termination the Commissioner would be required to apply the funds to the unfunded entitlements of other districts is a point we need not decide at this time.

[7] Memorandum for Assistant Secretary Huitt from General Counsel Willcox (Mar. 29, 1966); Memorandum for the Secretary from General Counsel Banta (Aug. 6, 1958) (HEW files do not indicate whether this memo was actually sent).

funds be obligated in the year for which the appropriation is made. However, inasmuch as the appropriation in question is relatively small and is consistent with the Administration's budget request, we see no need to discuss in greater detail the legal arguments which could be used to support a deferral of action to obligate the funds.

## II.

Notwithstanding the apparently mandatory provisions of Public Law 81-874, it has been suggested that the President has a constitutional right to refuse to spend funds which Congress has appropriated. In particular, there have been a number of statements by congressmen with respect to the very programs of the Office of Education presently under consideration that Congress could not force the President to spend money which he did not want to spend.

Section 406 of the Elementary and Secondary Education Amendments of 1967, Pub. L. No. 90-247, 81 Stat. 783 (1968) (as added by the Vocational Education Amendments of 1968, Pub. L. No. 90-576, § 301, 82 Stat. 1064, 1094), provides that notwithstanding any other provision of law, unless expressly in limitation of this provision, funds appropriated to carry out any Office of Education program shall remain available for obligation until the end of the fiscal year. The purpose of this provision was to deny to the President authority which he would otherwise have had under the Revenue and Expenditure Control Act of 1968, Pub. L. No. 90-364, §§ 202–203, 82 Stat. 251, 271–72, to reduce obligations and expenditures on Office of Education programs, and, in particular, the impacted area programs and title III of the National Defense Education Act of 1958, Pub. L. No. 85-864, 72 Stat. 1580, 1588 (codified at 20 U.S.C. §§ 441 *et seq.* (1964 & Supp. IV 1965–1968)). *See* 114 Cong. Rec. 29,155 (1968). During the debate in both Houses on this provision several members stated that section 406 would not interfere with the President's constitutional authority to reduce expenditures in the area of education. *See* 114 Cong. Rec. 29,159 (1968) (remarks of Sens. Dominick and Yarborough); 114 Cong. Rec. 29,481 (1968) (remarks of Congressmen Perkins and Quie).

Similar views were expressed almost contemporaneously in connection with the House of Representatives' consideration of a Senate amendment to the Labor-HEW appropriations bill, 1969 (H.R. 18037, 91st Cong.), which would exempt from both the Antideficiency Act and the Revenue and Expenditure Control Act an appropriation of $91 million for impacted area school assistance for fiscal 1968. In advising the House to accept the Senate amendment, Congressman Flood stated:

> Section 406 of the Vocational Education Act amendments seems to many and, I must say, not to others, to cover what the language in disagreement seeks to do; but in any event there are many instances in which it has been made clear that the President has the constitu-

tional powers to refuse to spend money which the Congress appropriates.

114 Cong. Rec. 30,588 (Oct. 10, 1968). Congressman Laird agreed:

> The language will not be interpreted as a requirement to spend because of the constitutional question which is involved. The Congress cannot compel the President of the United States to spend money that he does not want to spend.

*Id.* at 30,588–89. More recently, in the hearing on HEW's appropriation bill for fiscal 1970 (H.R. 13111, 91st Cong.), Congressman Smith stated his belief that HEW was not compelled to spend the funds appropriated for the impact aid program. *Hearings Before a Subcommittee of the House Appropriations Committee*, 91st Cong., pt. 3, at 263 (1969). Subcommittee Chairman Flood appeared to agree. *Id.* at 264.

Taken together these statements evidence broad congressional support for the proposition that the President has some residual constitutional authority to refuse to expend those funds to which section 406 applies. What is not clear is the nature or the precise source of the authority the speakers had in mind.

For the reasons discussed below we conclude that the President does not have a constitutional right to impound Public Law 81-874 funds notwithstanding a congressional direction that they be spent. However, before proceeding with discussion of the constitutional question we might note that the congressional statements cited above might be used in support of another argument for presidential authority, based on statutory interpretation. It might be argued that although these statements cannot affect the interpretation of Public Law 81-874, since they were not made in the course of enacting or amending that statute, nevertheless Public Law 81-874 is not self-executing, and its operation is expressly conditioned on the enactment of subsequent appropriations legislation. Therefore, in determining the duties of the Commissioner of Education one must construe the intent of both the substantive legislation, Public Law 81-874, and the appropriations legislation, and the present understanding of Congress, as evidenced by the statements above, is that the enactment of the appropriation does not create a duty to spend.

Up to a point this argument has a certain amount of validity. We do not doubt, for example, that notwithstanding the terms of Public Law 81-874, Congress could provide in its appropriation that the money need not be spent. Or it could enact an appropriation, and then provide in contemporaneous or subsequent legislation that the money need not be spent, as was done in title II of the Revenue and Expenditure Control Act of 1968, Pub. L. No. 90-364. However, the congressional statements cited above refer to the President's constitutional powers and not to congressional intent. It seems doubtful that one can infer from those statements,

most of them made in 1968, that Congress, in enacting the appropriations legislation in 1968, intended to exert less than its full authority to require the expenditure of funds appropriated to Public Law 81-874. Still, since at this writing the appropriations legislation has not yet been passed, it may be that legislative history may still be made which would support the argument that Congress does not intend to require the expenditure of the entire sum appropriated.

With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent. There is, of course, no question that an appropriation act permits but does not require the Executive Branch to spend funds. *See Federal-Aid Highway Act of 1956—Power of President to Impound Funds*, 42 Op. Att'y Gen. 347, 350 (1967). But this is basically a rule of construction, and does not meet the question whether the President has authority to refuse to spend where the appropriation act or the substantive legislation, fairly construed, requires such action.

In 1967, Attorney General Clark issued an opinion upholding the power of the President to impound funds which had been apportioned among the States pursuant to the Federal-Aid Highway Act of 1956, 23 U.S.C. §§ 101 *et seq.* (1964 & Supp. IV 1965–1968), but had not been obligated through the approval by the Secretary of Transportation of particular projects. *Federal-Aid Highway Act*, 42 Op. Att'y Gen. 347. This opinion appears to us to have been based on the construction of the particular statute, rather than on the assertion of a broad constitutional principle of executive authority. While the reasoning of the opinion might lend support to executive action deferring the obligation of funds under Public Law 81-815, we think the case of Public Law 81-874 is clearly distinguishable, because, among other reasons, impounding the Public Law 81-874 funds would result not in a deferral of expenditures but in permanent loss to the recipient school districts of the funds in question and defeat the congressional intent that the operations of these districts be funded at a particular level for the fiscal year.

While there have been instances in the past in which the President has refused to spend funds appropriated by Congress for a particular purpose, we know of no such instance involving a statute which by its terms sought to require such expenditure.

Although there is no judicial precedent squarely in point, *Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838), appears to us to be authority against the asserted presidential power. In that case it was held that mandamus lay to compel the Postmaster General to pay to a contractor an award which had been arrived at in accordance with a procedure directed by Congress for settling the case. The Court said:

> There are certain political duties imposed upon many officers in the executive department, the discharge of which is under the direction of the President. But it would be an alarming doctrine, that Con-

gress cannot impose upon any executive officer any duty they may think proper, which is not repugnant to any rights secured and protected by the constitution; and in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President. And this is emphatically the case, where the duty enjoined is of a mere ministerial character.

*Id.* at 610.

It might be argued that *Kendall* is not applicable to the instant situation because the Commissioner of Education's duties are not merely ministerial. *Cf. Decatur v. Paulding*, 39 U.S. (14 Pet.) 497, 515 (1840). On the other hand, while discretion is involved in the computation of the entitlement of the recipient districts, as we have pointed out, the application of the appropriation to the payment of entitlements pursuant to section 5(c) of Public Law 81-874 might reasonably be regarded as a ministerial duty. In any event, the former distinction between discretionary and ministerial duties has lost much of its significance in view of the broad availability of judicial review of agency actions and of a remedy in the Court of Claims for financial claims against the government. 28 U.S.C. § 1491 (1964). Thus, the mere fact that a duty may be described as discretionary does not, in our view, make the principle of the *Kendall* case inapplicable, if the action of the federal officer is beyond the bounds of discretion permitted him by the law.

In an opinion letter of May 27, 1937 to the President,[*] Attorney General Cummings answered in the negative the question whether the President could legally require the heads of departments and agencies to withhold expenditures from appropriations made. Insofar as the opinion concludes that a presidential directive may not bind a department head in the exercise of discretionary power vested in him by statute, this opinion appears inconsistent with the views expressed in the opinion of Attorney General Clark previously cited and with constitutional practice in recent years.[8] However, the Cummings opinion also rejects any idea that the President has any power to refuse to spend appropriations other than such power as may be found or implied in the legislation itself.

It is in our view extremely difficult to formulate a constitutional theory to justify a refusal by the President to comply with a congressional directive to spend. It may be argued that the spending of money is inherently an executive function, but the execution of any law is, by definition, an executive function, and it seems an anomalous proposition that because the Executive Branch is bound to execute the laws, it is free to decline to execute them. Of course, if a congressional directive to spend were to interfere with the President's authority in an area

---

[*] Editor's Note: That opinion letter is also included in this volume (*Presidential Authority to Direct Departments and Agencies to Withhold Expenditures From Appropriations Made*, 1 Op. O.L.C. Supp. 12 (May 27, 1937)).

[8] *See also The Jewels of the Princess of Orange*, 2 Op. Att'y Gen. 482 (1831) (Taney, A.G.).

confided by the Constitution to his substantive direction and control, such as his authority as Commander in Chief of the Armed Forces and his authority over foreign affairs, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–22 (1936), a situation would be presented very different from the one before us. But the President has no mandate under the Constitution to determine national policy on assistance to education independent from his duty to execute such laws on the subject as Congress chooses to pass.

It has been suggested that the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, might justify his refusal to spend, in the interest of preserving the fiscal integrity of the government or the stability of the economy. This argument carries weight in a situation in which the President is faced with conflicting statutory demands, as, for example, where to comply with a direction to spend might result in exceeding the debt limit or a limit imposed on total obligations or expenditures. *See, e.g.*, Pub. L. No. 91-47, tit. IV, 83 Stat. 49, 82 (1969). But it appears to us that the conflict must be real and imminent for this argument to have validity; it would not be enough that the President disagreed with spending priorities established by Congress. Thus, if the President may comply with the statutory budget limitation by controlling expenditures which Congress has permitted but not required, he would, in our view, probably be bound to do so, even though he regarded such expenditures as more necessary to the national interest than those he was compelled to make.[9]

If Congress should direct the expenditure of funds in the carrying out of a particular program or undertaking, say, construction of a public building, but without limiting the Executive's discretion in such a way as to designate the recipient of the appropriated funds, a better argument might perhaps be made for a constitutional power to refuse to spend than is available in the formula grant

---

[9] We understand that the operation of the expenditure limitation imposed by title IV of Public Law 91-47 may require curtailment of certain controllable expenditures. Paradoxically, title IV would not conflict with the increase over budgeted amounts in appropriations provided by the Joelson Amendment, because the expenditure limitation would automatically be adjusted upward. Nevertheless, we are informed that it might prove difficult to comply with title IV without cutting back on expenditure of budgeted funds for Public Law 81-874 and other Office of Education programs. Whether in such a situation title IV could be viewed as conflicting with and thus superseding the requirements of Public Law 81-874 depends to a large extent on the Executive's spending options at that time. Two considerations cause us to hesitate to infer from title IV a grant of authority to the President to impound appropriations for formula grants for education. First, title IV, as passed by the Senate, contained specific language permitting the impounding of funds appropriated for formula grants and other mandatory programs, but exempting from this authority education programs. The conference report contained neither the grant of authority nor the exception. H.R. Rep. No. 91-356 (1969) (Conf. Rep.). Second, section 406 of the Elementary and Secondary Education Amendments (as added by the Vocational Education Amendments of 1968) would conflict with such a grant of authority, and there is legislative history to the effect that title IV of Public Law 91-47 was not intended to alter the effect of section 406 of the Elementary and Secondary Education Amendments. *See* 115 Cong. Rec. 18,928–29 (1969). Nevertheless, we do not rule out at this time the possibility that in appropriate circumstances title IV might permit the impounding of such funds.

situation presented by Public Law 81-874. Or this might be viewed simply as a situation in which the duty to spend exists but there is no constitutional means to compel its performance.

### III.

As to the availability of a remedy, if our conclusion that section 5 of Public Law 81-874 requires expenditure of the appropriation is correct, we believe that the recipient school districts will probably have a judicial remedy. It is true that unlike Public Law 81-815, Public Law 81-874 has no specific provision for judicial review of a refusal to make a grant. However, absence of such a provision does not imply that no judicial review was intended. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 139–46 (1967). It may be that a suit to compel the Commissioner to apply the appropriation would be inappropriate, *see Land v. Dollar*, 330 U.S. 731, 738 (1947), but if the school districts are legally entitled to payment under the statute, they can sue the government in the Court of Claims. 28 U.S.C. § 1491. Such a suit would raise interesting legal problems, for it is clear that "entitlement" under Public Law 81-874 is not itself equivalent to a legal obligation to pay, and it is doubtful that even entitlement plus appropriation creates a vested right which may not be destroyed by subsequent congressional action. Accordingly, technical defenses might prevent recovery by a school district even if the court concluded that the Executive Branch had a statutory duty to spend the appropriation.

WILLIAM H. REHNQUIST
*Assistant Attorney General*
*Office of Legal Counsel*