**FARR MAN AND CO., INC., and The National Sugar Refining Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Court No. 79–10–01490.**

United States Court of International Trade.

July 26, 1982.

were also tainted by impermissible *ex parte* communications.

Barnes, Richardson & Colburn, New York City (Rufus E. Jarman, Jr., and Jacqueline M. Nolan-Haley, New York City, on the briefs), for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, New York City, Intern. Trade Field Office, Commercial Litigation Branch (Madeline B. Kuflik, New York City, on the briefs), for defendant.

Before RE, C. J., and LANDIS and BOE, JJ.[1]

BOE, Judge:

By the institution of this action contesting the duty imposed upon raw sugar imported into the United States from Argentina, the validity and/or proper application of Presidential Proclamation 4547, has been placed in issue.

No material fact relied upon by plaintiffs or defendant is in controversy in their respective motions for summary judgment. *Schoenfeld & Sons, Inc. v. United States*, 3 C.I.T. ——, Slip Op. 82–33 (April 30, 1982); *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (1975).

In an effort to remedy the insufficiency of import fees previously established by Proclamation No. 4538, President Carter, upon the advice and recommendation of the Secretary of Agriculture, promulgated Proclamation No. 4547 under date of January 20, 1978. In so doing, the President acted upon his belief that:

> * * * 'sugars,' are being, or are practically certain to be, imported into the United States under such conditions and in such quantities as to render or tend to render ineffective, or to materially interfere with the price support operations now being conducted by the Department of Agriculture for sugar cane and sugar beets, or to reduce substantially the amount of any product being processed in the United States from such domestic sugar beets and sugar cane. * * * Pres-

---

1. The three-judge panel in this case was designated by the Chief Judge upon application of the parties pursuant to rule 77(d)(2) of this court.

910

idential Proclamation No. 4547, Fed.Reg., Vol. 43, No. 16.

The Proclamation provided in pertinent part:

With the following exceptions, this proclamation applies to articles entered, or withdrawn from warehouse, for consumption after 12:01 a. m. (Eastern Standard Time) on the day following its issuance. One exception shall be for the sugars of Malawian origin which entered the United States before February 15, 1978, pursuant to contracts for delivery to the United States entered into before November 11, 1977. Further, if it is established to the satisfaction of the Commissioner of Customs that articles subject to proclamations 4538 and 4539 exported to the United States before November 11, 1977, or imported to fulfill forward contracts for delivery to the United States entered into before November 11, 1977, could have been, but were not, entered for consumption on or before January 1, 1978, as a result of the delay in transportation to a point within the limits of a Customs port of entry of the United States because of windstorm, fog, or similar stress of weather, the provisions of proclamations 4538 and 4539 shall not apply to the articles even though they are entered for consumption after January 1, 1978 nor shall the provisions of this proclamation be applicable to them. The proclamation shall continue to apply until I have acted on the Report of the United States International Trade Commission.

■ In its motion for summary judgment, defendant contends that the President's exercise of authority pursuant to section 22 of the Agricultural Adjustment Act of 1933, 48 Stat. 31, 7 U.S.C. § 624, as amended, is discretionary and therefore not subject to review by this court. This contention is without merit. *See Suwannee Steamship Company v. United States*, 435 F.Supp. 389, 392–393 (1977).

In assuming jurisdiction this court's review is confined to whether the President's grant of an exemption to sugar of Malawian origin has been exercised in conformity with the procedural requirements of statutory authority and whether such action of the President has been performed according to law. *Best Foods, Inc. v. United States*, 147 F.Supp. 749 (Cust.Ct.1956); *Montgomery Ward & Co., Inc.* and *The United States v. Zenith Radio Corp.*, 673 F.2d 1254 (Cust & Pat.App.) (1982), (mandate of CCPA stayed until August 2, 1982, to permit plaintiff, *Zenith Radio Corp.*, to file a petition for certiorari before the United States Supreme Court).

The plaintiffs do not question the authority of the President to designate exemptions in a Presidential Proclamation. The exemption relating to shipments of sugar which were not entered for consumption before January 1, 1978, as a result of delay caused by windstorm, fog or similar stress of weather is acknowledged to be a valid and proper exercise of the discretionary authority of the President, because it applied uniformly to all exporting countries.

It appears to logically follow from the plaintiffs' recognition of the President's authority to designate exemptions that their objection to the specific exemption of sugar of Malawian origin is not premised upon the discretionary right of the President to designate such an exemption. Rather, plaintiffs' objection to the latter exemption is premised upon (1) the President's reliance upon advice from the Secretary of State in granting the Malawian exemption and (2) the existence of a treaty, trade agreement and other laws which allegedly preclude the granting of such an exemption to a single country only.

Section 22 of the Agricultural Adjustment Act, as amended (7 U.S.C. § 624), from which the President acknowledges a specific grant of authority for the promulgation of Proclamation 4547, is set forth herein:

§ 624. Limitation on imports; authority of President

(a) Whenever the Secretary of Agriculture has reason to believe that any article or articles are being or are practically certain to be imported into the United States under such conditions and in such

quantities as to render or tend to render ineffective, or materially interfere with, any program or operation undertaken under this title or the Soil Conservation and Domestic Allotment Act, as amended or section 32, Public Law Numbered 320, Seventy-fourth Congress, approved August 24, 1935, as amended [7 USCS § 612c], or any loan, purchase, or other program or operation undertaken by the Department of Agriculture, or any agency operating under its direction, with respect to any agricultural commodity or product thereof, or to reduce substantially the amount of any product processed in the United States from any agricultural commodity or product thereof with respect to which any such program or operation is being undertaken, he shall so advise the President, and, if the President agrees that there is reason for such belief, the President shall cause an immediate investigation to be made by the United States Tariff Commission [United States International Trade Commission], which shall give precedence to investigations under this section to determine such facts. Such investigation shall be made after due notice and opportunity for hearing to interested parties, and shall be conducted subject to such regulations as the President shall specify.

(b) If, on the basis of such investigation and report to him of findings and recommendations made in connection therewith, the President finds the existence of such facts, he shall by proclamation impose such fees not in excess of 50 per centum ad valorem or such quantitative limitations on any article or articles which may be entered, or withdrawn from warehouse, for consumption as he finds and declares shown by such investigation to be necessary in order that the entry of such article or articles will not render or tend to render ineffective, or materially interfere with, any program or operation referred to in subsection (a) of this section, or reduce substantially the amount of any product processed in the United States from any such agricultural commodity or product thereof with re-

spect to which any such program or operation is being undertaken: Provided, That no proclamation under this section shall impose any limitation on the total quantity of any article or articles which may be entered, or withdrawn from warehouse, for consumption which reduces such permissible total quantity to proportionately less than 50 per centum of the total quantity of such article or articles which was entered, or withdrawn from warehouse, for consumption during a representative period as determined by the President: And provided further, That in designating any article or articles, the President may describe them by physical qualities, value, use or upon such other bases as he shall determine.

In any case where the Secretary of Agriculture determines and reports to the President with regard to any article or articles that a condition exists requiring emergency treatment, the President may take immediate action under this section without awaiting the recommendations of the Tariff Commission [International Trade Commission], such action to continue in effect pending the report and recommendations of the Tariff Commission [International Trade Commission] and action thereon by the President.

(c) The fees and limitations imposed by the President by proclamation under this section and any revocation, suspension, or modification thereof, shall become effective on such date as shall be therein specified, and such fees shall be treated for administrative purposes and for the purposes of section 32 of Public Law Numbered 320, Seventy-fourth Congress, approved August 24, 1935, as amended [7 USCS § 612c], as duties imposed by the Tariff Act of 1930, but such fees shall not be considered as duties for the purpose of granting any preferential concession under any international obligation of the United States.

\*     \*     \*     \*     \*     \*

(e) Any decision of the President as to facts under this section shall be final.

(f) No trade agreement or other international agreement heretofore or hereafter entered into by the United States shall be applied in a manner inconsistent with the requirements of this section.

Except for certain procedural requirements, section 22 of the Agricultural Adjustment Act, as amended, grants to the President broad discretionary powers. Subsections (a) and (b) clearly indicate that upon the advice and recommendation by the Secretary of Agriculture with respect to the adverse effect of imported articles on domestic agricultural commodities the President determines whether a "reason for such belief exists." If the President causes a further investigation to be made by the International Trade Commission, he, in turn, must agree with the facts submitted in the Commission's investigative report before imposing a fee or a quantitative limitation on the imported articles. The President has been authorized to describe the imported articles in a proclamation by physical qualities, value, use, or *upon such other basis as he shall determine.* The determination of the amount of fees and limitations upon imports, their revocation, suspension or modification [2] as well as the finality given to any decision of the President as to facts made under the provisions of section 22,[3] as amended, cogently illustrate the intent of the Congress thereby to delegate the broadest discretionary authority to the President.

■ In the absence of a conflicting or contravening provision, this court is of the opinion that a postponement in the implementation of the provisions of Presidential Proclamation 4547 upon the exports of a country or countries because of existing unique extenuating circumstances beyond their control, is within the discretionary authority delegated to the President by section 624.

■ The plaintiffs protest the action of the President exempting sugar of Malawian origin because the information on which this exemption was based had been provided to the President by the State Department. Since section 22 of the Agricultural Adjustment Act refers only to the Secretary of Agriculture and the Secretary's obligation to furnish the initial information as to imports which may interfere or threaten to interfere with domestic agricultural programs, the plaintiffs contend that the procedural requirements of the statute dictate that the President's determinations and actions be predicated only on the reports and recommendations of the Secretary of Agriculture. With this reasoning the court cannot agree. The procedural requirements with respect to the actions to be performed by the President upon the report and recommendations received from the Secretary of Agriculture are clear. The Secretary's recommendation pertains to those facts and matters which evidence a material interference with any program or operation conducted by the Department of Agriculture relating to domestic agricultural commodities. It is upon information of this character that the President will act if he is in agreement therewith. The amount of the fees which the President may impose and the time of implementation of any proclamation providing for the same are matters which lie solely within the discretion of the President. Where foreign policy and the intricacies of foreign affairs impinge upon the implementation of a domestic agricultural commodities program, it can only be expected that the President's principal foreign policy adviser, the Secretary of State, should make a report and inform him with respect to factors related thereto. It would be naive to believe that a determination made by the President within his discretionary authority must emanate only from his own mind unaffected by any counsel, advice or report he may have received relating to the multitude of problems and situations confronting him daily.

The scope of the Agricultural Adjustment Act encompasses not only domestic economic matters of national interest and import

**2.** 7 U.S.C. § 624(c).

**3.** 7 U.S.C. § 624(e).

but also matters of foreign policy related thereto. The discretionary authority delegated to the President in section 22 of the Act often involves his representative role in the arena of foreign affairs. The decision in *South Puerto Rico Sugar Company Trading Corp. v. United States*, 167 Ct.Cl. 236, 334 F.2d 622, 630–31 (1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 654, 13 L.Ed.2d 558 (1965), construing an amendment to the Sugar Act of 1948, recognizes the "coloration" which foreign affairs normally can be expected to impart to a discretionary authority contained in statutes such as in issue herein.

But a statute giving any substantial discretion with respect to the importation of a critical commodity like sugar from competing foreign countries can normally be expected to involve foreign policy in applying that discretion. In the intercourse of nations, changes in economic relationships have many an important political corollary. It would be difficult, and probably unwise, to separate an executive choice in that area from the 'important, complicated, delicate and manifold problems' facing the President in the 'vast external realm' (*United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 220 (1936)). It is for this reason, we judge, that Congress granted power in the Act of July 6th to the President himself, not to the Secretary of Agriculture whose usual duty it was to apply the quota mandates of the Sugar Act of 1948. Within the limited sphere of discretion left to him, the President, with the advice of the State Department as well as of the Agriculture Department, could appraise and balance both foreign and domestic elements.

The decision continues:

The presence of foreign factors adds still more to the range of the powers transmitted by the phrase because, as the Supreme Court has explicitly recognized, a delegation of unusually extensive discretion to the President is not uncommon in the external realm. 'Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.'

*See* also *Youngstown Sheet & Tube Co., et al. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *United States v. Curtiss-Wright Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

In the instant action a prior protective order of the court has placed a cloak of confidentiality around certain documents produced by the defendant upon the demand of the plaintiffs. An examination of the same *in camera* discloses that the President in granting the Malawian exemption has exercised a discretionary judgment as to facts which he, with the aid of special advisers, has evaluated in the light of complicated and delicate political conditions existing at the time.

Plaintiffs further contend that the exemption granted to sugar of Malawian origin contravenes prior treaty and statutory obligations of the United States. Although in their prayer for relief contained in the complaint, plaintiffs seek a judgment declaring the exemption in Presidential Proclamation 4547 relating to sugar of Malawian origin to be void or voidable, it would appear that such relief is inconsistent with the gravamen of plaintiffs' arguments presented to the court. Plaintiffs' cross-motion for summary judgment is predicated upon the contention that by the exemption of sugars of Malawian origin, Presidential Proclamation 4547 violated the most-favored-nation provision and treatment specifically provided for in the treaty of 1853 between the United States and Argentina, the trade agreement between the respective countries entered into under date of October 14, 1941, and the General Agreement on Tariffs and Trade (GATT) (codified at 19 U.S.C. § 1881). Accordingly, plaintiffs urge, the importation of Argentina sugar is entitled to similar treatment. It is difficult

to reconcile plaintiffs' request for treatment similar to the Malawian exemption with its request for judgment declaring that very exemption void.

Despite the apparent inconsistencies in the grounds for relief urged by the plaintiffs, the court directs its attention to plaintiffs' argument that the Malawian exemption contravenes prior United States international agreements.

Article VI of the Constitution of the United States provides in pertinent part:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; * * *

Article III of the treaty between the United States and Argentina entered into in the year 1853 upon which plaintiffs rely provides:

The two high-contracting parties agree that any favor, exemption, privilege, or immunity whatever, in matters of commerce or navigation, which either of them has actually granted, or may hereafter grant, to the citizens or subjects of any other government, nation, or State, shall extend, in identity of cases and circumstances to the citizens of the other contracting party, gratuitously, if the concession in favor of that other government, nation, or State, shall have been gratuitous; or, in return for an equivalent compensation, if the concession shall have been conditional. 10 Stat. 1005, 1006–1007.

The provision contained in the trade agreement between the United States and Argentina of October 14, 1941, is illustrative of the most-favored-nation provision generally contained in such agreements between the United States and other nations:

The United States of America and the Argentine Republic will grant each other unconditional and unrestricted most-favored-nation treatment in all matters concerning customs duties and subsidiary charges of every kind and in the method of levying duties, and, further, in all matters concerning the rules, formalities and charges imposed in connection with the clearing of goods through the customs, and with respect to all laws or regulations affecting the sale or use of imported goods within the country.

Accordingly, articles the growth, produce or manufacture of either country imported into the other shall in no case be subject, in regard to the matters referred to above, to any duties, taxes or charges other or higher, or to any rules or formalities other or more burdensome, than those to which the like articles the growth, produce or manufacture of any third country are or may hereafter be subject. 56 Stat. 1687–1688.

The court examines plaintiffs' basic contention that the exemption granted to sugar of Malawian origin by Presidential Proclamation 4547 violated the most-favored-nation provision contained in the treaty of 1853 and the trade agreement of 1941 between the United States and Argentina.

■ It is a well established doctrine that where a conflict exists between the provisions of a treaty and a statute enacted by Congress, the one which is the latest in time of enactment shall prevail. In *Whitney v. Robertson*, 124 U.S. 190, 193, 8 S.Ct. 456, 457, 31 L.Ed. 386 (1888), the United States Supreme Court has clearly enunciated this doctrine:

By the Constitution a Treaty is placed on the same footing, and made of like obligation with an Act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the Treaty on the subject is self executing. If the country with which the Treaty is made is dissatisfied with the action of the legislative

department, it may present its complaint to the executive head of the government, and take such other measures as it may deem essential for the protection of its interests. The courts can afford no redress. Whether the complaining Nation has just cause of complaint, or our country was justified in its legislation, are not matters for judicial cognizance.

See also *Reid v. Covert*, 354 U.S. 1, 18, 77 S.Ct. 1222, 1231, 1 L.Ed.2d 1148 (1957); *Andrew Akins v. United States*, 64 CCPA 68, 551 F.2d 1222 (1977); *Minerva Automobiles, Inc. v. United States*, 25 CCPA 324, 96 F.2d 836 (1938).

In the consideration, therefore, of section 22 in connection with the instant action, the basic issue is presented: do the provisions of that section, as amended, prevail over the existing treaty and trade agreements between the United States and Argentina? Legislative history with respect thereto is revealing.

The Congress in the enactment of the Agricultural Adjustment Act has recognized that the national interest requires that orderly marketing conditions for domestic agricultural commodities be maintained in order to protect producers and consumers and to provide an orderly flow of supply to the market, thereby avoiding unreasonable fluctuation in supplies and prices.[4] The successive amendments to section 22 of the Act evidence an intent on the part of Congress to cause the provisions thereof to prevail over any treaty and trade obligation which might be in conflict therewith.

On July 3, 1948, subsection (c) of section 22 was amended to provide:

[b]ut such fees [imposed by the President by means of a proclamation] shall not be considered as duties for the purpose of granting any preferential concession under any international obligation of the United States.

The legislative history relating to this amendment establishes the purpose for the inclusion of this language. The term, "fees," was used in order to provide a justification for continuing the preferential treatment which had for a long period of time been extended to sugar exported from Cuba. H.R.Rep.No.1776, 80th Cong., 2d Sess. (April 21, 1948).[5]

The foregoing amendment marks a demonstrative effort on the part of Congress to continue to provide preferential treatment for certain imports, despite the recognition of the most-favored-nation provisions included in our international treaties. As further indicated by the legislative history, *supra*, the deletion of the term "duties," and the substitution of the term "fees," was deemed necessary because the express language which *then* remained in subsection (f) of section 22 prohibited the enforcement of a proclamation in contravention of any treaty or trade agreement to which the United States is a party.

The desire and the ultimate design of Congress to circumscribe the most-favored-nation treatment provided for in treaties and the international agreements which might conflict with section 22 became increasingly evident upon the enactment of the amendment to subsection (f) on June 28, 1950. This amendment provided that future international agreements or amendments to existing agreements must "give effect" to section 22 within the framework of the General Agreement on Tariffs and Trade.

The steadily increasing sentiment for the full protection of domestic agricultural commodities from price depression and fluctuations caused by foreign imports culminated in the enactment of the amendment to subsection (f) of section 22 under date of June 16, 1951. Subsection (f), as amended, provides:

No trade agreement or other international agreement heretofore or hereafter entered into by the United States shall be applied in a manner inconsistent with the requirements of this section.

---

4. 7 U.S.C. § 601, 602.

5. Reprinted in [1948] U.S.Code Cong. & Ad. News 2320, 2325.

Any ambiguity with respect to the intent of the Congress in the enactment of the foregoing amendment to subsection (f) is dispelled by a review of the extensive legislative history relating thereto.[6]

Statements by the members of the Senate Finance Committee in explaining the present subsection (f) at the time of its consideration and enactment by the Senate body present a clear picture of the temper and legislative disposition of Congress. Senator Butler in explaining the purport of the amendment to subsection (f) stated:

> Thus, our Government with one hand through the Commodity Credit Corporation was trying to hold up the price of domestic farm products; with the other hand, through the trade-agreements program, it was helping to knock them down.

> Whenever any attempt was made to correct this situation through section 22 of the Agricultural Adjustment Act, we were told that no quota or additional import fee could be imposed on such imports by the Secretary of Agriculture, because we had entered into trade agreements which prohibited us from protecting our domestic farm prices.

> This bill attempts to correct that situation. It states flatly that no trade agreement shall be applied in a manner inconsistent with section 22 of the Agricultural Adjustment Act. I do not think there can be any misunderstanding about the meaning of this provision. By this section, Congress is serving clear notice that it wants our domestic agricultural price structure to be protected. 97 Cong.Rec. 5669, 82d Cong., 1st Sess. (May 23, 1951).

In responding to the inquiry of Senator Morse as to why the committee was not disposed to strike from the proposed amendment to subsection (f) the words "with the requirements," Senate Finance Committee member Millikin explained:

> In my opinion, the language was put into the bill deliberately to strengthen

rather than to weaken that section. It is intended to make it clear that our domestic programs under section 22 shall prevail and shall override anything inconsistent found in international agreements. That is the purpose of the language, to make it very clear that the requirements or the provisions of section 22, shall prevail and shall override all other inconsistent things to be found in international agreements. *Id.* at 5730.

Senator George, Chairman of the Committee, in summarizing the purpose, intent and effect of the amendment of subsection (f) to section 22 stated:

> Mr. President, I was discussing section 22, and I will restate a part of what I said because it is most important. Subsection (f) of section 22 contains certain limitations upon the full scope of its use by reason of the provisions of our trade agreements. That is, that was the way the matter stood before the amendment was recommended by the committee. The amendment recommended by the committee reverses this situation, and provides that if a case should arise where required action under section 22 would conflict with any trade agreement, then the action under section 22 shall prevail. The committee, of course, assumes that where a choice of remedies under section 22 makes it possible, the President will probably choose a course not incompatible with our foreign commitments. *Id.* at 5492.

With respect to the phraseology "the requirements of," contained in subsection (f), the Senator concluded:

> I should like to add that the purpose of inserting this language is that if the President, when certain facts appear, can give an effective remedy without violating an agreement, but within the terms of an agreement, so to speak, he may have that opportunity; but if he cannot, this section will prevail. This section carries out the philosophy of the distin-

6. *United States v. J. E. Bernard & Co., Inc.*, 42     CCPA 69, C.A.D. 573 (1954).

guished Senator from Washington in the two bills which have previously passed the Senate. *Id.* at 5722.

■ This court is fully satisfied that the amendments to section 22, as well as their legislative history, clearly evidence the intent of Congress that the powers delegated to the President therein be neither diminished nor contravened by the provisions of any treaty or trade agreement between the United States and Argentina or the provisions of the General Agreement on Tariffs and Trade. The amendments to subsections (c) and (f) of section 22 were enacted subsequent to the treaty and the trade agreements between the United States and Argentina, and therefore prevail in matters concerning which a conflict might exist. *Whitney v. Robertson, supra.* The concession or benefit which may have been accorded to Malawi by the exemption relating to its sugar, as provided in Presidential Proclamation 4547, was within the discretionary authority delegated by the Congress to the President in section 22, as amended. The President's exercise of the powers so delegated to him was not in violation of, and in fact superseded, the most-favored-nation provisions contained in the treaty and any international agreement between the United States and Argentina or in the General Agreement on Tariffs and Trade.

The motion of the defendant for summary judgment is granted, and the cross-motion of the plaintiffs for summary judgment is denied.

Let judgment be entered accordingly.