# The President's Authority to Adjust Sugar Quotas

The President, pursuant to an executive agreement codified in the Tariff Schedules of the United States, Schedule 1, Part 10, Subpart A, Headnote 2, may reduce Nicaragua's share of the annual quota of imported sugar on the basis of foreign policy concerns, if he finds that it is in the best interests of the United States and he gives "due consideration," as defined by law, to Nicaragua's interests in the United States sugar market.

April 25, 1983

MEMORANDUM OPINION FOR THE COUNCIL TO THE PRESIDENT

Recent events in Nicaragua have led the President to consider reducing the amount of sugar which may be imported into the United States from that nation. This memorandum addresses whether the President has the legal authority to reduce Nicaragua's present share of the United States sugar quota using the authority of a specific provision of an Executive Agreement.[1] Our review of this Executive Agreement in the context of prior practice under it, the case law construing it, and the history of Presidential activity related to the imposition of export controls similar to the pending proposal, persuades us that the President has the requisite legal authority. We should note that this memorandum does not address questions that have been raised about the validity of the proposed action under various international agreements to which the United States and Nicaragua are parties.[2] We understand that the Office of the Legal Adviser at the Department of State will be giving you its views directly on these issues, and we anticipate reviewing its analysis in the near future in connection with our customary review of a proposed proclamation.

---

[1] We have also examined several other sources of authority for the contemplated action· § 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862; § 22 of the Agricultural Adjustment Act, 7 U.S C. § 624; and the International Emergency Economic Powers Act (IEEPA), 50 U S.C. §§ 1701 *et seq.* Of these, we have rejected the first two as being inappropriate bases for the proposed action and have concluded that only IEEPA would be a clear source of authority. We understand that there are policy reasons which argue persuasively against use of IEEPA. The only other potential source of authority of which we are aware is the Executive Agreement.

[2] Article XVI of the Treaty of Friendship, Commerce and Navigation between the United States and the Republic of Nicaragua, 9 U.S.T. 450, T.I.A.S. 4024 (1956), forbids either party to impose discriminatory import restrictions. Article XIII of the General Agreement on Tariffs and Trade, discussed below, obliges contracting parties to apply quotas in a non-discriminatory fashion. Article 58 of the International Sugar Agreement, T.I.A.S. 9644, obligates every importing member to guarantee "access" to its markets for exporting members.

# I. History of Presidential Authority

In 1962, Congress authorized the President to negotiate trade agreements with foreign countries for the reduction or modification of existing duties or import restrictions. Trade Expansion Act of 1962 (Act), § 201 (codified at 19 U.S.C. § 1821).[3] These agreements were to help promote the Act's listed purposes.[4] During rounds of talks involving the General Agreement on Tariffs and Trade (GATT),[5] the President, using the authority of the Act, negotiated an Executive Agreement permitting him to set and adjust quotas for sugar imported into the United States.[6] Executive agreements have the force of law unless overridden by Congress.

The opening paragraph of the Agreement was originally negotiated as part of the 1949 round of GATT negotiations held in Annecy, France. 64 Stat. B139, B145. In 1951, during the round held in Torquay, England, the United States

---

[3] The statute provides in pertinent part:

> (a) Whenever the President determines that any existing duties or other import restrictions of any foreign country or the United States are unduly burdening and restricting the foreign trade of the United States and that any of the purposes stated in section 1801 of this title will be promoted thereby, the President may —
>
> (1) after June 30, 1962, and before July 1, 1967, enter into trade agreements with foreign countries or instrumentalities thereof; and
>
> (2) proclaim such modification or continuance of any existing duty or other import restriction, such continuance of existing duty free or excise treatment, or such additional import restrictions, as he determines to be required or appropriate to carry out any such trade agreement.

[4] These purposes are listed in 19 U.S.C. § 1801:

The purposes of this chapter are, through trade agreements affording mutual trade benefits —

> (1) to stimulate the economic growth of the United States and maintain and enlarge foreign markets for the products of United States agriculture, industry, mining, and commerce;
>
> (2) to strengthen economic relations with foreign countries through the development of open and nondiscriminatory trading in the free world; and
>
> (3) to prevent Communist economic penetration.

[5] The GATT is a multilateral trade agreement encompassing most of the major trading countries  Although GATT's General Articles, which set out the basic trade policy commitments of the contracting parties, were negotiated in the late nineteen-forties, seven other rounds of negotiations have led to many further agreements and revisions, all of which are subsumed within references to "the GATT."

[6] The full text of the agreement provides:

> The rates in the tariff schedule shall be effective only during such time as title II of the Sugar Act of 1948 or substantially equivalent legislation is in effect in the United States, whether or not the quotas, or any of them, authorized by such legislation, are being applied or are suspended: *Provided,*
>
> (i) *That, if the President finds that a particular rate* not lower than such January 1, 1968, rate, limited by a particular quota, *may be established for any articles* provided for in item 155.20 or 155.30, which will give *due consideration to the interests in the United States sugar market of domestic producers and materially affected contracting parties to the General Agreement on Tariffs and Trade,* he shall proclaim such particular rate and such quota limitation, to be effective not later than the 90th day following the termination of the effectiveness of such legislation;
>
> (ii) *That any rate and quota limitation so established shall be modified if the President finds and proclaims that such modification is required or appropriate to give effect to the above considerations;* and
>
> (iii) That the January 1, 1968, rates shall resume full effectiveness, subject to the provisions of this headnote, if legislation substantially equivalent to title II of the Sugar Act of 1948 should subsequently become effective

(Emphasis added.)

negotiated subparagraphs (i)-(iii), *see* 3 U.S.T. 586, 615, 1171 (1951), which were proclaimed as part of domestic law twice, first in 1951, *see* Proclamation 2929, 3 C.F.R. 111 (1949–1953 Comp.), and again in 1967 after they had been the subject of further negotiations in the Kennedy Round. Proclamation 3822, 3 C.F.R. 167, 175 (1966–1970 Comp.). This latter Proclamation added the agreement to the Tariff Schedules of the United States (TSUS) as a headnote to the schedules on sugar. TSUS, Schedule 1, Part 10, Subpart A, Headnote 2. The codification of the Agreement as a headnote to the sugar tariff has led to its being referred to as the Headnote authority, and it will be referred to as such during the rest of this memorandum.

The Headnote authority was negotiated pursuant to § 201 of the Trade Expansion Act of 1962 which, of course, specifically provided for the negotiation of trade agreements providing for the establishment of import quotas and, more pertinent here, for the "modification" of such quotas "as [the President] determines to be . . . appropriate to carry out any such trade agreement." *See supra* note 3. One of the principle purposes of the Act was "to prevent Communist economic penetration." 19 U.S.C. § 1801(3).[7]

Subparagraphs (i)-(iii) of the Headnote were negotiated as contingent authority for the President for the time when the Sugar Act of 1948, 7 U.S.C. §§ 1100–1123 (1970 & Supp. I 1971), which had been given several extensions, would expire.[8] Therefore, when the Sugar Act expired in 1974, the President was able to use his authority under the Headnote to proclaim a duty and quota on imported sugar. Both the duty and the quota have been extensively modified in subsequent Proclamations.[9] The most recent modification occurred last spring, when the President reduced the annual global sugar quota from 6,900,000 short tons to approximately 2,800,000, allocating the quota on a country-by-country basis that reflected each country's average percentage of imports over a period of years.[10] Proclamation 4941, 47 Fed. Reg. 19961, 19962 (1982).[11]

---

[7] The statutory basis for the Headnote was recently confirmed in *United States Cane Sugar Refiners' Ass'n* v. *Block,* 683 F.2d 399, 402–03 (C C.P A. 1982).

[8] At the time the Headnote was negotiated, and until the Sugar Act expired in 1974, the President had explicit authority under the Sugar Act to adjust quotas on imported sugar "whenever and to the extent that the President finds that the establishment or continuation of a quota or any part thereof for any foreign country would be contrary to the national interest of the United States." Pub. L. No 89–331, 79 Stat. 1271, 1273 (1965) (codified at 7 U.S.C. § 1112(d)(1)(B) (Supp. II 1965–66)). *See also* 7 U.S.C. § 1112(d)(1)(B) (Supp. IV 1974). In negotiating an Executive Agreement designed to replace the Sugar Act when it expired, the President evidenced no desire to deny himself this authority to take foreign policy concerns into account when adjusting sugar quotas, an authority that the courts had confirmed as belonging to the President under the Sugar Act even before Congress made it explicit. *See South Puerto Rico Sugar Co. Trading Corp.* v. *United States,* 334 F.2d 622 (Ct. Cl. 1964), *cert. denied,* 379 U.S 964 (1965).

[9] *See* Proclamation 4888, 3 C.F.R. 77 (1982); Proclamation 4770, 3 C.F.R. 81 (1981); Proclamation 4720, 3 C.F.R. 14 (1981); Proclamation 4663, 3 C.F.R. 40 (1980); Proclamation 4610, 3 C.F.R. 67 (1978); Proclamation 4539, 3 C.F.R. 62 (1978); Proclamation 4463, 3 C.F.R. 56 (1976); Proclamation 4334, 3 C.F.R 420 (1971–1975 Comp.).

[10] This reduction was substantial because the 6,900,000 short-ton quota had been purposefully set so high that it was never reached. Thus, the United States had effectively had no quota on sugar prior to this action.

[11] The President took this action after Congress had intervened in the sugar market by enacting Pub. L. No. 97–98, 95 Stat. 1213, 1257 (1981), which raised support prices for domestic sugar producers The President
Continued

Domestic importers challenged the quota established in 1982 by Proclamation 4941 as being beyond the President's authority, but the Court of International Trade found that the imposition of quotas was legal because the Headnote, on which the action was based, was a valid exercise of the authority granted to the President under § 201 and the President had taken the procedural steps required by the Headnote. *United States Cane Sugar Refiners' Ass'n* v. *Block (Sugar Cane I),* 544 F. Supp. 883 (Ct. Int'l Trade), aff'd, *United States Cane Sugar Refiners' Ass'n* v. *Block (Sugar Cane II),* 683 F.2d 399 (C.C.P.A. 1982).[12]

## II. Analysis

The President would now like to reduce the 2.1% share of the annual quota allocated last spring to Nicaragua because he believes that Nicaragua is using the hard currency derived from sugar sales to buy arms for anti-government guerrillas in El Salvador. The President would like to revise Proclamation 4941 to reduce Nicaragua's percentage from 2.1% of the annual quota — now about 2,800,000 tons — to .21%, resulting in the importation from Nicaragua of about 6000 tons rather than almost 60,000. The legal issue is whether the Headnote permits the President to reduce Nicaragua's percentage of the quota to this level. Because the President, in making this adjustment, would not be lowering the overall import quota or otherwise affecting domestic producers of sugar, and because the action would presumptively have a negative effect on Nicaragua, which is the only affected GATT member, the proposed action would appear not to be authorized by the Headnote's language unless the Headnote can be read to permit this action on the basis of the President's foreign policy concerns after giving the interests of Nicaragua the "due consideration" required by the Headnote.

The Headnote authorizes the President to modify sugar quotas — such as the one established for Nicaragua last spring — whenever he finds:

> that such modification is required or appropriate to give effect to the [interests in the United States sugar market of domestic producers and materially affected contracting parties to the GATT].

Headnote, subparagraph (ii). As noted above, Presidents have been modifying sugar quotas since 1974. They have couched their findings in the language of subparagraph (i) of the Headnote under which the original quota was established — i.e., they have made a finding that the quota will give "due consider-

---

[11] (. . . continued)
thereafter exercised his authority under § 22 of the Agricultural Adjustment Act, 7 U.S.C. § 624, to impose fees on imported sugar in December 1981, and, on May 5, 1982, used the Headnote to adjust the quota on imported sugar by issuing Proclamation 4941, *supra.*

[12] The Court of International Trade, 28 U.S.C. § 251(a) (Supp. V 1981), is an Article III court with exclusive jurisdiction over certain trade matters. *Id.* § 1581. Its decisions are reviewed by the Court of Customs and Patent Appeals. *Id.* § 1541(a).

ation" to these interests. *Id. See supra* note 9.[13] Because Presidents since 1974 have read the standard under subparagraph (ii) to be identical to that imposed originally by subparagraph (i), we believe that the appropriate question is what "due consideration" means.

As summarized in the Headnote's legislative history, a quota could be proclaimed under subparagraph (i) "provided that the President, *after giving due consideration* to the interests of both domestic producers and materially affected contracting parties in the United States sugar market, should find that such rate and duty should be established." *Analysis of Torquay Protocol of Accession, Schedules, and Related Documents* 317, 347 (1951) (emphasis added). This provision appears to establish a standard that is essentially procedural, rather than substantive, requiring merely that the President consider, before acting, the effect the new quota will have on these two interests rather than setting a standard under which the President can only act if the new quota would arguably protect or advance the interests of domestic producers or of affected GATT members in the United States sugar market.[14] In short, "due consideration" means "fitting or appropriate" consideration,[15] — a finding that is committed to the President's discretion.[16] As a legal matter, we believe that the President's determination that this proposed action would be in our national interest after his consideration of its potential, and presumptively negative, impact on Nicaragua, would be fully authorized by the Headnote and would specifically advance one of the original purposes of the Trade Expansion Act of 1962, "to prevent Communist economic penetration." 19 U.S.C. § 1801(3).[17] Indeed, a contrary conclusion would require us to take the position that Congress and the President, in the series of legislative and executive actions discussed in note 8, *supra,* intended to strip the Executive of his acknowledged power to adjust sugar quotas and duties on the basis of our national interest. We therefore believe that the Headnote authorizes modification of sugar quotas and

---

[13] Subparagraph (i) by its terms only authorized action during the 90 days after the Sugar Act of 1948 expired. *See supra* note 6. Thereafter, modifications of the quota established under subparagraph (i) were done under the authority of subparagraph (ii).

[14] The Proclamations issued under the Headnote since 1974 do not resolve the issue, because the quotas put in place were so high that the issue of whether a particular quota failed to give "due consideration" to a GATT member's interests has apparently never arisen. *See supra* note 10.

[15] *The American Heritage Dictionary of the English Language* 403 (1976). *See also Webster's New International Dictionary* (2nd ed.) 796.

[16] In exercising that discretion, the President may consider foreign policy concerns. Congress is generally presumed to be aware that foreign policy concerns influence Presidential decisionmaking when it grants the kind of broad power found in § 201 of the Trade Expansion Act of 1962. *See Farr Man & Co.* v. *United States,* 544 F. Supp. 908, 910 (Ct. Int'l Trade 1982); *South Puerto Rico Sugar Co. Trading Corp.* v. *United States,* 334 F.2d 622 (Ct. Cl. 1964), *cert. denied,* 379 U.S. 964 (1965). *See also United States* v. *Yoshida Int'l Inc.,* 526 F.2d 560 (C.C.P.A. 1975); *supra* note 8.

[17] We note that the reduction in Nicaragua's quota, some 54,000 short tons, is scheduled to be redistributed to Honduras, El Salvador and Costa Rica, three countries that may be threatened by actions taken by the government of Nicaragua. Thus, in cutting Nicaragua's quota, the President will both diminish Nicaragua's ability to penetrate the market for sugar in the United States and presumably diminish Nicaragua's ability to interfere in the economies of those three countries. Both of these effects would appear to advance the purpose of the Trade Expansion Act of 1962 as declared in 19 U.S.C. § 1801(3).

that the President may modify Proclamation 4941 to reduce Nicaragua's percentage of our sugar quota if he makes the required findings.

## Conclusion

The Headnote authorizes the President to adjust sugar quotas. *Sugar Cane I* and *Sugar Cane II* hold that he may modify the quotas on a country-by-country basis. If the President finds that reducing Nicaragua's percentage of our annual quota is in this Nation's best interest and if he finds that the quota will give "appropriate" consideration to Nicaragua's interests in our sugar market, we believe that his action in reducing the quota will be authorized by the Headnote.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*